Raul S. Zavala, pro se, Reg. No. 11174-085

1 Federal Way/P.O. Box 019001

United States Penitentiary Atwater

Atwater, California 95301

**FILED IN THE**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

**MAR 23 2009**

**JAMES R. LARSEN, CLERK**
_____DEPUTY
**SPOKANE, WASHINGTON**

United States District Court

Eastern District of Washington

| Raul Zavala, | Case No. _____
|              |              CV-09-13
| Petitioner-Appellant, | U.S.Dist.Cs.No. CR-05-00105-LRS
| -vs- | U.S.Dist.Cs.No. CV-05-00133-LRS
|      | 9CCA App.No. 06-35654
| UNITED STATES OF AMERICA, | MOTION FOR RECONSIDERATION: To
| Respondent-Appellee. | Vacate March 6, 2009 Judgment
| _____ | Pursuant to Fed.R.Civ.P. 59(e)

COMES NOW, Petitioner, Raul Zavala, acting pro se,
and motions this honorable Court for an Order to Alter or
Amend Judgment pursuant to Rule 59(e) of the Federal Rules of
Civil Procedure ("Fed.R.Civ.P."). Specifically, Petitioner
seeks that this Court Vacate its March 6, 2009, judgment to
prevent manifest injustice. Petitioner's Rule 59(e) Motion
enables this Court to reconsider and correct errors of law
and fact appearing on the face of the record.

JURISDICTION

Petitioner submits that this motion is timely in that
it is being filed in compliance and within the ten-day
limitation period of Rule 59(e) of the Fed.R.Civ.P.

## I. FACTS

1.      Trial for Petitioner commenced on January 23, 2006; On January 25, 2006, Petitioner was found guilty by a trial jury.

2.      On April 18, 2006, Petitioner was sentenced to imprisonment of life with supervised release precluded on Count 1; and imprisonment of 8 years, concurrent, on Count 2.

3.      On April 20, 2006, Judge Cynthia Imbrogno appointed Attorney Karen S. Lindholdt for Petitioner for appeal of trial disposition.

4.      On April 22, 2006, Petitioner, acting pro se, prematurely filed a Title 28 U.S.C. § 2255 Motion, and an Affidavit of Bias.

5.      On April 24, 2006, Petitioner's appellate counsel, Ms. Lindholdt, lodged notice of appeal for Petitioner: 9CCA Appeal No. 06-30265.

6.      On June 23, 2006, Honorable Judge Suko issued an Order denying Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (2255).

7.      On June 29, 2006, Petitioner filed a Notice of Appeal (§2255 Motion): Case No. 06-0133.

8.      On July 14, 2006, honorable Judge Suko denied Petitioner's Certificate of Appealability.

9.      On July 17, 2006, a copy of docket case no. 06-35654 entries were forwarded to the Ninth Circuit Court of Appeal.

10.     On July 25, 2006, the Clerk's record on Appeal case no. 06-35654 were forwarded to the Ninth Circuit Court of Appeal.

11.     On August 7, 2006, clerk's record were forwarded to the Ninth Circuit Court of Appeal regarding appeal case no. 06-35654.

12.     On November 27, 2006, Petitioner filed a Motion for Relief from Judgment Pursuant to Rule 60(b)(1)(6) of the Federal Rules of Civil Procedure.

13.     On February 2, 2007, the District Court issued an Order Staying Defendant/Petitioner's Rule 60(b)(1)(6) Motion.

14.     On September 4, 2007, the Ninth Circuit Court of Appeal issued an Order vacating the district court's judgment and remanded to the district court with instructions to dismiss appellant's 2255 motion without prejudice.

15.     On August 30, 2007, a Copy of the Ninth Circuit Court of Appeal Order was issued vacating and remanding the district court's judgment.

16.     On August 30, 2007, the Ninth Circuit Court of Appeal issued a Mandate Vacating and Remanding the district court's judgment. Case No. 06-35654.

17.     On September 21, 2007, honorable Judge Suko issued an Order denying Petitioner's 28 U.S.C. § 2255 Motion without prejudice.

## II. ARGUMENT

The Federal Rules of Civil Procedure do not expressly recognize motions for "reconsideration." Instead, such motions are treated typically as motions to alter or amend a judgment under Rule 59(e). Often, a "reconsideration" motion will depend on the date it is filed. If filed within the 10-

day period set for Rule 59(e) motions, the "reconsideration" will be evaluated under Rule 59(e).

Petitioner submits that this motion must be evaluated under Rule 59(e) as it is being filed in compliance and within the ten-day limitation period of Rule 59(e) of the Fed.R.Civ.P.

Petitioner's timely filed Rule 59(e) motion enables this honorable Court, with jurisdiction, to reconsider the validity of this Court's (March 6, 2009) judgment, and to vacate or alter it as this Court sees fit.

Petitioner contends that Rule 59(e) provides a means whereby the Court may alter or amend judgment. Northern Cheyenne Tribe v. Hodel, 842 F.2d 224, 227 (9th Cir.1998); United States v. Western Elc. Co., 690 F.Supp. 22, 25 (D.D.C.1988) (Rule 59(e) motion not to be used as vehicle to relitigate matters already disposed of, but simply permits courts to correct errors of fact appearing on the face of the record or errors of law.

It is well-established that a proper Rule 59(e) motion may urge a court to reconsider or vacate a prior judgment. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Petitioner urges this Court to vacate its March 6, 2009, judgment for the reasons as follow: 1) This Court erroneously concluded that Petitioner's Title 28 U.S.C. § 2255 Motion, which was timely filed January 2, 2009, was a Successive Motion; and 2) This Court failed to rule and file a Memorandum of Points and Authorities stating the reasons why Petitioner's Motion for Recusal should be Denied or

Granted, prior to denying, in part, and staying Petitioner's miscellaneous motions.

GROUND ONE: This Court erroneously concluded that Petitioner's Title 28 U.S.C. § 2255 Motion, which was timely filed January 2, 2009, was a Successive Motion.

On January 2, 2009, Petitioner timely filed his 28 U.S.C. § 2255 Motion. On March 6, 2009, honorable Judge Suko entered a judgment staying Petitioner's § 2255 Motion and miscellaneous Motions. See attached judgment: ER 1550-52.

Petitioner argues that the Court erroneously concluded that Petitioner's § 2255 Motion was a Second and Successive Motion.

On August 30, 2007, the Ninth Circuit Court of Appeal issued an Order: vacated and remanded to the district court with instructions to dismiss appellant's § 2255 motion without prejudice. ER 509. (ER denotes Excerpts of Record).

Moreover, on August 30, 2007, the Ninth Circuit Court of Appeal also issued its judgment concerning case no. 06-35654. ER 510.

Lastly , on September 21, 2007, in the United States District Court for the Eastern District of Washington, honorable Judge Suko entered an Order denying Petitioner's 28 U.S.C. 2255 without prejudice. ER 497.

In its March 6, 2009, judgment, the Court (Judge Suko) has failed to point out the facts or law for which its March 6, 2009, judgment is based on.

Petitioner's Rule 59(e) motion is properly before this honorable Court. As a general rule, a motion to reconsider is the opportunity for the court to correct

manifest errors of law or fact: In Petitioner's case, an erroneous judgmment on the face of the record.

GROUND TWO:    This Court failed to rule and file a Memorandum of Points and Authorities, stating the reasons why Petitioner's Motion for Recusal should be Denied or Granted, prior to denying, in part, and staying Petitioner's miscellaneous motions.

Petitioner respectfully advances to this honorable Court that the honorable Court's (Judge Suko) adversarial, delayed and erroneous, present and previous, rulings are precisely the points that fueled and illustrate Petitioner's motive to have filed a Motion for Recusal.

On December 7, 2008, Petitioner, under penalty of perjury (28 U.S.C. § 1746), filed a Motion for Recusal. See Ct. Rec. 190: Case No. CR-05-105-LRS.

Petitioner submits that appropriate circumstances for a Rule 59(e) Motion for Reconsideration are where the court has obviously misapprehended a party's position, the facts or the law.

Annexed as Exhibit A is Petitioner's previously filed Motion for Recusal. Petitioner's previously filed Motion for Recusal illustrates additional behavioral patterns similar to that as outlined above in Ground One. Please see, Exhibit A.

III. RELIEF REQUESTED

Though a Rule 59(e) motion apparently may raise any ground in its claim for relief, the motion itself should state its grounds with the particularity required by 7(b)(1).

Rule 7(b)(1) of the Federal Rules of Civil Procedure provides that all applications to the court for orders shall be by motion, which unless made during a hearing or trial, "shall be made in writing, [and] shall state with particularity the grounds therefor, and shall set forth the relief or order sought." The standard for "particularity" has been determined to mean "reasonable specification."

For the particular reasons stated above, Petitioner prays that this honorable Court:

a.     Vacate its erroneously concluded judgment entered on March 6, 2009, Court Record 205, by treating Petitioner's § 2255 Motion as a Successive Motion;

b.     Appropriately Rule on Petitioner's Motion for Recusal by issuing a Memorandum of Points and Authorities, and findings of fact stating why Petitioner's Motion for Recusal is being Denied or Granted;

c.     Allow Petitioner's Title 28 U.S.C. § 2255 be entertained at the District level by a different Judge.

d.     Allow Petitioner to supplement Petitioner's Motion for Reconsideration.


## IV. CONCLUSION

Petitioner's Rule 59(e) motion provides a mechanism by which this honorable Court may, specifically, vacate its erroneous judgment, entered on March 6, 2009, without implicating the appellate process.

To avoid the necessity of an appeal, this Court's March 6, 2009, judgment must be vacated.

DATED this 18th day of March, 2009.



Raul S. Zavala

## CERTIFICATE OF SERVICE

I, Raul Zavala, hereby certify that on March 18, 2009, I served a true and correct copy of the following: "MOTION FOR RECONSIDERATION: To Vacate March 6, 2009 Judgment Pursuant to Fed.R.Civ.P. 59(e)," which is deemed filed at the time it was delivered to prison mail authorities for forwarding, Houston v. Lack, 101 L.Ed.2d 245 (1988); See also, Faile v. Upjohn Co., 988 F.2d 985, 988 (9th Cir.1993), upon the below mentioned, by placing same in a sealed, postage prepaid envelope addressed to: United States District Court for the Eastern District of Washington, P.O. Box 1493, Spokane, Washington 99210, and deposited same in the United States Mail at the United States Penitentiary in Atwater, California, 1 Federal Way/P.O. Box 019001, Atwater, California 95301.

In statu quo, the Houston Rule applies equally to Fed.R.Civ.P. Rule 59(e) Motions. See, Simmons v. Ghent, 970 F.2d 392, 393 (7th Cir.1992).

I declare under penalty of perjury, pursuant to Title 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my ability.

DATED this 18th day of March, 2009.

Raul S. Zavala

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NOS.  CR-05-0105-LRS |
| Respondent, | ) | CV-06-0133-LRS |
| | ) | |
| -vs- | ) | ORDER DENYING 28 U.S.C. §2255 |
| | ) | MOTION WITHOUT PREJUDICE |
| RAUL S. ZAVALA, | ) | |
| Movant. | ) | |
| | ) | |

On June 23, 2006, this Court entered an order denying Raul Zavala's §2255 motion. (Ct. Rec. 151). On September 4, 2007, the Court received an Order from the Ninth Circuit Court of Appeals, vacating the district court judgment and remanding to this Court with instructions to dismiss Mr. Zavala's (movant/appellant) §2255 motion without prejudice pursuant to *Feldman v. Henman*, 815 F.2d 1318, 1320 (9th Cir.1987).

Accordingly, the Clerk of the Court is hereby DIRECTED to vacate the district court judgment and dismiss Movant Zavala's §2255 motion, Ct. Rec. 163, without prejudice.

**IT IS SO ORDERED.**

The District Court Executive is DIRECTED to file this Order, and provide copies to counsel and Movant.

**DATED** this 21st day of September, 2007.

s/*Lonny R. Suko*
_____
LONNY R. SUKO
UNITED STATES DISTRICT JUDGE

ORDER - 1

**FILED**

**AUG 30 2007**

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>RAUL S. ZAVALA,<br><br>Defendant - Appellant. | No. 06-35654<br><br>D.C. Nos. CV-06-00133-LRS<br>CR-05-00105-LRS<br>Eastern District of Washington,<br>Spokane<br><br>ORDER |

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 27 2007

JAMES R. LARSEN, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

Before: HAWKINS, BYBEE and M. SMITH, Circuit Judges.

The court has received and reviewed the parties' responses to this court's March 30, 2007, order to show cause. The district court's judgment is vacated and remanded to the district court with instructions to dismiss appellant's § 2255 motion without prejudice. *See Feldman v. Henman*, 815 F.2d 1318, 1320 (9th Cir. 1987).

**VACATED and REMANDED.**

A TRUE COPY
ATTEST    9/21/14

CATHY A. CATTERSON
Clerk of Court

by:
    Deputy Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | *CR-05-105-LRS* |
| Plaintiff - Appellee, | No.  06-35654 |
| | D.C. No.  CV-06-00133-LRS |
| V. | |
| | **JUDGMENT** |
| RAUL S. ZAVALA, | |
| Defendant - Appellant. | |

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 27 2007

JAMES R. LARSEN, CLERK
DEPUTY
SPOKANE, WASHINGTON

Appeal from the United States District Court for the Eastern District of Washington (Spokane).

This cause came on to be heard on the Transcript of the Record from the United States District Court for the Eastern District of Washington (Spokane) and was duly submitted.

On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is **VACATED and REMANDED**.

Filed and entered 08/30/07

A TRUE COPY
ATTEST  9/21/07

CATHY A. CATTERSON
Clerk of Court

By:
Deputy Clerk

1

2

3

4

5

6                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF WASHINGTON
7
  UNITED STATES OF AMERICA,
8
                                        NO. CR-05-0105-LRS
9              Plaintiff,                NO. CV-06-0133-LRS

10        v.                            **ORDER RE: MISCELLANEOUS**
                                        **MOTIONS**
11  RAUL S. ZAVALA,

12                   Defendant-
                     Movant.
13

14

15      BEFORE THE COURT is Defendant-Movant Raul Zavala's Motion for

    Extension of Time to File, Ct. Rec. 188; Movant's Motion for Recusal, Ct.
16
    Rec. 190; Movant's Motion for Leave to File Excess Pages, Ct. Rec. 192;
17
    Movant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C.
18
    § 2255, Ct. Rec. 193; Movant's Motion For 30-day Extension of Time, Ct.
19
    Rec. 197; and Movant's Motion to Stay of Proceedings of Petitioner's
20
    §2255 Motion Until Motion for Recusal is Completely Resolved, Ct. Rec.
21
    198.
22
                              **DISCUSSION**
23
        Defendant-Movant Zavala has filed a second or successive 28 U.S.C.
24
    §2255 motion with this court.  The movant again moves this Court for an
25
    order recusing the undersigned.  Additionally, movant requests additional
26

    ORDER ~ 1

time and excess pages for which to prepare his briefing for the second 28 U.S.C. § 2255 motion.

A second or successive §2255 motion must be certified as provided in 28 U.S.C. § 2244 by a panel of the Ninth Circuit Court of Appeals to contain: (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.  Before a second or successive motion can be filed in this court, defendant must file a motion with the Ninth Circuit Court of Appeals for an order authorizing this court to consider the second or successive §2255 motion.  28 U.S.C. § 2244(b)(3)(A).  A three judge panel of the court of appeals will consider the motion to file a second or successive §2255. §2244(b)(3)(B). The court of appeals is to grant or deny the authorization to file a second or successive §2255 motion not later than 30 days after the filing of the motion seeking such authorization.  §2244 (b)(3)(D).

Accordingly,

1.  The District Executive shall close CV-06-0133-LRS and forward defendant's §2255 motion to the Clerk of the Court for the Ninth Circuit Court of Appeals for a determination of whether defendant shall be allowed to file a second or successive §2255 motion with this court.

2.  Defendant-Movant Raul Zavala's Motion for Extension of Time to File, **Ct. Rec. 188,** is **DENIED** without prejudice.

ORDER ~ 2

3.   Defendant-Movant's Motion for Recusal, **Ct. Rec. 190**, is **STAYED** pending the Ninth Circuit Court of Appeals's decision re: filing a second or successive §2255 motion.

4.   Defendant-Movant's Motion for Leave to File Excess Pages, **Ct. Rec. 192**, is **STAYED** pending the Ninth Circuit Court of Appeals's decision re: filing a second or successive §2255 motion.

5.   Movant's Motion For 30-day Extension of Time, **Ct. Rec. 197**, is **DENIED** without prejudice.

6.   Movant's Motion to Stay of Proceedings of Petitioner's §2255 Motion Until Motion for Recusal is Completely Resolved, **Ct. Rec. 198**, is **STAYED** pending the Ninth Circuit Court of Appeals's decision re: filing a second or successive §2255 motion.

**IT IS SO ORDERED.**   The District Executive shall forward copies of this order to the defendant and to the Clerk of the Court for the Ninth Circuit Court of Appeals.

**DATED** this __6th__ day of March, 2009.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
United States District Judge

ORDER ~ 3

EXHIBIT FOR RULE 59(e) MOTION PURSUANT

TO FEDERAL RULES OF CIVIL PROCEDURE:

# EXHIBIT A

U.S.DIST. CASE NO. CR-05-00105-LRS

U.S.DIST. CASE NO. CV-05-00133-LRS

NINTH CIRCUIT COURT OF APPEAL: APPEAL NO. 06-35654

Petitioner: Raul S. Zavala, Reg. No. 11174-085

Address: United States Penitentiary Atwater

1 Federal Way/P.O. Box 019001

Atwater, California 95301

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 22 2008

JAMES R. LARSEN, CLERK
DEPUTY
RICHLAND, WASHINGTON

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Raul S. Zavala, | MOTION FOR RECUSAL |
| Petitioner-Defendant, | 28 U.S.C. § 455(a) and (b)(1) |
| | (Honorable Judge Lonny R. Suko: |
| -vs- | CR-05-00105-LRS) |
| | |
| UNITED STATES OF AMERICA, | |
| Respondent-Plaintiff. | |

---

NOW COMES the Petitioner, Raul S. Zavala, proceeding pro se, in the above captioned case, hereby respectfully requests honorable Judge Lonny R. Suko's recusal from consideration of any and all forthcoming motions submitted under U.S. v. Zavala, Raul; Cause No: CR-05-00105-LRS.

Petitioner seeks from this Court leave to proceed before a different judge whose impartiality is not open to any reasonable questions pursuant to Title 28 U.S.C. § 455(a) and (b)(1).

Title 28 U.S.C. § 455 subsection (a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."' and

subsection (b)(1) provides that "[h]e shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;...."

In support to Petitioner's Motion for Recusal, the following facts, exhibits, and authorities are presented as follows:

Petitioner's "Motion for Recusal" of honorable Judge Lonny R. Suko ("Judge Suko") from case U.S. v. ZAVALA, Raul; cause no: CR-05-00105-LRS is based on Judge Suko's questionable "impropriety," and his personal knowledge surrounding "disputed evidentiary facts" concerning proceedings directly related to Petitioner's case.

Petitioner's case arises out of an unrecorded alleged statement made to law enforcement by Luis Ramirez Partida ("Partida"). On April 27, 2005, Mr. Partida was caught red handed and as a result, facing a life sentence if convicted, becomes a Confidential Source ("CS").

On April 28, 2005, Mr. Partida's uncorroborated alleged statement to law enforcement subjected Petitioner to a warrantless arrest followed by a bifurcated suppression hearing: First Suppression Hearing was held on November 8, 2005; and Second Hearing was held on December 12, 2005.

During the month of May of 2005, Judge Suko inherited Petitioner's case from honorable Judge Magistrate Cynthia Imbrogno.

During the months of June thru October of 2005, plea negotiations (interrogations) consisting of four interviews

occurred, but the process failed for reasons that are not on the record. (ER 1-4).

On or about August 12, 2005, Petitioner, via an Attorney-Client visit in an interview room located on the 2nd West floor of the Spokane County Jail (ER 5-6), learned that, because of Petitioner's race, he should not proceed with his case to trial. While in the interview room, Petitioner's attorney, Frank Louis Cikutovich ("Cikutovich"), stated, "Don't take it to trial. They don't give a f*ck about you. You're Mexican!" Mr Cikutovich's comment to Petitioner generated severe suspicion, and led Petitioner to believe that he might not get a fair trial.

Petitioner was in disbelief that his ethnic background would cause such an impact on the forthcoming judicial proceedings. However, at the time, the source of the animosity towards Petitioner was unclear, whether it would derive from the jury, the U.S. Attorney or the Judge, or them altogether.

On October 12, 2005, during a pretrial conference, Judge Suko conducted an "in chambers" conference with the U.S. Attorney and Mr. Cikutovich. Immediately after the "in chambers" conference, Mr. Cikutovich returned to the Defense table and stated that Judge Suko had indicated that they (U.S. Attorney and Mr. Cikutovich) need to come to an agreement because he (Judge Suko) didn't want to give this kid (Petitioner) life.

The transcript of the November 8, 2005, suppression hearing (Agent Sean Cummings testimony) (ER 7-8), and record entry 66 in the PACER docket (ER 9), illustrate that during a

conference dated November 7, 2005, held at 6:30 p.m., and in the absence of Petitioner, Judge Suko secured information directly related to "disputed evidentiary facts."

At this, after hours, conference Judge Suko learned that two interpreters (Rodney Weeks and Tom LaVigne) were unable to understand one word of the audio recordings. (ER 7-8). Petitioner submits that under Federal Rules of Criminal Procedure (FRCrP) Rule 17.1 Judge Suko had a duty to prepare and file a memorandum of any matters agreed to during the November 7, 2005 conference. (ER 10). The Federal Rule 17.1 of Criminal Procedure dictates that "[w]hen a conference ends, the court 'MUST' prepare and file a memorandum of any matters agreed to during the conference." (emphasis added). Petitioner submits that the record or PACER docket do not illustrate that Judge Suko prepared a memorandum outlining the matters had during the November 7, 2005 conference.

During trial, dated January 23-25, 2006, the U.S. Attorney introduced, apparently, intelligible audio recordings. At this point, it was immediately noticeable to Mr. Cikutovich that the audio recordings introduced were not the same audio recordings previously listened to during the November 7, 2005 conference. Mr. Cikutovich, skeptical and in disbelief as to the authenticity of the audio recordings, expressed, with suspicion, his concerns surrounding the audio recordings. (ER 11-12).

At this juncture, it was apparent, by the documented record, that Judge Suko had "personal knowledge" concerning the disputed evidentiary value of the audio recordings due to the fact that the PACER docket indicates that Judge Suko

presided at the November 7, 2005 conference. (ER 9). However, Judge Suko ignored his personal knowledge, secured from the November 7, 2005 conference, and allowed Petitioner to be tried with audio recordings he knew not to be the same from the ones that he listened to during the November 7, 2005 conference.

Petitioner submits that Judge Suko's failure to take corrective action, based on his personal knowledge concerning the disputed evidentiary facts surrounding the audio recordings, subjected his impartiality to the reasonable open line of questioning pursuant to Title 28 U.S.C. § 455(a) and (b)(1).

Also, during Petitioner's January 23-25, 2006 trial, Agent Joseph Pence was observed gesturing (signaling) to testifying witnesses. Petitioner submits that during a court recess one of the trial spectators sitting in the front row directed his observations, in form of an outburst, to Petitioner. In his outburst to Petitioner, the spectator indicated that the person (Agent Joseph Pence) sitting at the prosecution table was signaling to the testifying witness. The trial spectator discussed his observation's with Mr. Cikutovich. When Mr. Cikutovich returned for talking to the spectator, Petitioner and Mr. Cikutovich discussed Agent Pence's conduct, of signaling to the witness, and Mr. Cikutovich responded, "I know. The Judge is watching everything."

Petitioner submits that Judge Suko observed Agent Pence signaling to the testifying witness: Agent Jay Mehring. Judge Suko's failure to discharge hid duty in taking

corrective action concerning Agent Pence's conduct places his impartiality in the open line of questioning. Petitioner believes a similar pattern of conduct by Agent Joseph Pence occurred during the December 12, 2005 suppression hearing, where the same witness (Agent Jay Mehring) testified under oath.

Moreover, on January 19, 2006, four days before Petitioner's January 23-25, 2006 trial, another conference was held in the absence of Petitioner. The transcript to this conference outlines that Judge Suko learned that the U.S. Attorney had concealed facts surrounding a government witness by the name of Victor Zavala (No relation to Petitioner). In addition, the disclosure of the concealed facts revealed that Mr. Cikutovich was burdened by an existing conflict of interest. The transcript for the January 19, 2006 conference, further illustrates that Judge Suko secured information to a conflict of interest, and further expressed his concerns surrounding Mr. Cikutovich's conflicting interests. (ER 13-24).

However, Judge Suko did not resolve Mr. Cikutovich's conflicting interests, and, as a result, scheduled a conference for the following day of January 20, 2006 (ER 23), which was apparently, not held. As a result, Petitioner proceeded through trial against the mandates of his Constitutional right to conflict-free representation.

The transcript to the January 19, 2006 conference further outlines that Judge Suko had indicated that Petitioner "should be available in court so he could listen to this discussion." In addition, Judge Suko stated that this

situation "is going to require the consent of the defendant." Further, during the last day of trial (January 25, 2006) Judge Suko briefly indicated that Victor Zavala "is a person who could be called or should be called." (ER 25-28). Despite Judge Suko's grave concerns surrounding the conflict, Judge Suko chose not to personally inquire as to whether Petitioner had been informed about Mr. Cikutovich's previous representation of government witness Victor Zavala. The record reflects that Judge Suko had every opportunity to personally address Petitioner concerning Petitioner's right to conflict-free representation, but Judge Suko chose not to do so.

Petitioner submits that Judge Suko ignored his independent duty of assuring that Petitioner receive a trial that is fair, especially one that did not contravene Petitioner's Sixth Amendment right protected by the Constitution to the United States.

Petitioner also submits that, again, pursuant to FRCrP Rule 17.1, Judge Suko failed to prepare and file a memorandum outlining the matters had and agreed to during the January 19, 2006 conference.

Petitioner submits that reason to question Judge Suko's impartiality was everywhere.

Another incident warranting a reason to question Judge Suko's impartiality occurred on January 24, 2006. During the January 24, 2006 trial, Judge Suko heard sharply contradicting testimony by the government witnesses. Evenmore remarkable, is when Judge Suko learned that the substance of Agent Jay Mehring's and Agent Sullivan's, under oath,

testimony clearly exceeded the required proof for perjury.

Previously, Petitioner had made numerous vehement assurances to Mr. Cikutovich that the police reports had been fabricated. Despite Petitioner's assurances, Mr. Cikutovich failed to argue and elaborate on Petitioner's assurances.

However, during the conclusion of the December 12, 2005 suppression hearing, Mr. Cikutovich, did, in fact, expressed his severe concerns surrounding the government's unusual course of proceedings during Petitioner's warrantless arrest, and the suspicious preparation and unusual disclosure of the police reports. (ER 29-30).

For example, during the December 12, 2005 suppression hearing, Judge Suko learned that on December 12, 2005, Agent Mehring testified that him and Agent Tom Sullivan prepared, by typing, a report of investigation. (ER 31). This report outlined Petitioner's warrantless arrest. Judge Suko further learned that the report had been generated in the middle of Petitioner's suppression hearing. (ER 32-35). Judge Suko also learned that the newly created report exhibited great controversy with the initial report dated April 29, 2005, which outlined Petitioner's April 28, 2005 arrest. (ER 29). Surprisingly, Judge Suko also learned that the observations in the December 2, 2005 report, were not just Agent Mehring's observations, but Agent Sullivan's also. Further, Judge Suko learned that, in the presence of Agent Mehring, Agent Sullivan had typed his observations in the December 2, 2205 report. (ER 31).

Consequently, Agent Mehring and Agent Sullivan were called at trial. During trial, Agent Mehring maintained his

December 12, 2005 position, and testified that him and Agent Sullivan had each typed their April 28, 2005 observations, in the December 2, 2005 report. (ER 36).

Remarkably, in that, Agent Sullivan, under oath, during trial testified that he did not do any typing in the December 2, 2005 report. (ER 37). Agent Sullivan further clarified, with certainty and testified, "[M]y recollection is he (Agent Mehring) was sitting at the keyboard typing the report, however, I was there while he was typing it." (ER 38).

Petitioner submits that Judge Suko learned, by way of Agent Mehring and Agent Sullivan's sharply contradicting testimony, about the fraud in preparing the police report. Judge Suko's inaction surrounding these precise matters severely aggrandized the compelling reasons to question Judge Suko's impartiality under 28 U.S.C. § 455(a) and (b)(1).

However, at this juncture, Petitioner submits that this was not the final manifestation that warranted immediate inquiry into the reasonableness to question Judge Suko's impartiality.

In support, Petitioner further submits that Judge Suko was aware that the government's case rested on the testimony of government witness Mr. Partida. During the January 24, 2006 trial, Judge Suko learned that Mr. Partida had been testifying with testimony Mr. Partida knew not to be true.

The fact that Mr. Partida had testified with testimony he knew not to be true had been further supported when Agent Pence conceded to Mr. Partida's lies. (ER 39-41).

The record illustrates Judge Suko's knowledge concerning the perjury by Mr. Partida.

In fact, during cross-examination, Mr. Partida testified that he did not know a person by the name of "Rosa." (ER 39-41). Upon learning of this falsity, by Mr. Partida, Judge Suko took no action, and remained silent, nor did Judge Suko attempt to bring Mr. Partida's lies to the attention of the U.S. Attorney to correct the false testimony of Mr. Partida. It took Mr. Cikutovich's request for a sidebar to attempt to correct Mr. Partida's false testimony.

Because of Mr. Partida's false testimony, Mr. Cikutovich requested a sidebar, and, as a result, the trial jury was temporarily removed from the courtroom. In the absence of the jury, the U.S. Attorney indicated to Mr. Partida that he needed to "tell the whole truth." (ER 42).

Afterwards, the jury was brought back into the courtroom, and without Judge Suko's inquiry into the U.S. Attorney's obligation to inform the jury about Mr. Partida's false testimony, and without giving an instruction to the jury, Petitioner's trial resumed. (ER 43-44).

Despite this remarkable event to correct Mr. Partida's false testimony, and, in addition, the U.S. Attorney's admonishment to Mr. Partida that he needed to "tell the whole truth," Judge Suko permitted Mr. Partida to proceed testifying with perjurious testimony.

Here, Judge Suko had consequently gained additional knowledge concerning the fact that Mr. Paritda had proceeded to testify with information know, by him, the U.S. Attorney and Mr. Cikutovich, not to be true.

Later in the proceedings, during the ruling on Petitioner's Rule 29 Motion to Set Aside Verdict of the Jury, Judge Suko ignored his personal knowledge concerning Mr. Partida's false trial testimony.

At the end of the U.S. Attorney's case Mr. Cikutovich moved for Rule 29 Motion to Set Aside Verdict of the Jury, Judge Suko, in denying Petitioner's Rule 29 Motion, referred to Mr. Partida's testimony, stated, "if the testimony is to be believed...." (ER 45). Here, Judge Suko clearly ignored the remarkable event surrounding the removal of the jury from the courtroom, which occurred in the midst of trial, for the sole purpose of correcting Mr. Partida's false testimony.

Petitioner advances to this Court that Judge Suko's repeated decisions to ignore his personal knowledge, and, additionally, his manifestations of impropriety, by not taking corrective action based on his personal knowledge, clearly places his impartiality in the line of questioning under 28 U.S.C. § 455(a) and (b)(1).

Additionally, during Petitioner's January 25, 2005 trial, Judge Suko observed the U.S. Attorney conduct himself in a highly unusual manner. So unusual, in that, the U.S. Attorney, without notice to Judge Suko or Mr. Cikutovich, sprung inadmissible evidence before the jury, which in turn caused an outburst with four repeated objections by Mr. Cikutovich. Mr. Cikutovich's four repeated objections were to prevent further display of the inadmissible evidence to the jury.

The U.S. Attorney introduced a shoebox, a shoe, and testimony of Agent Pence. (ER 46-52). The jury was

temporarily removed from the courtroom. Judge Suko did not allow further use of the shoebox and shoe, but, shockingly to Mr. Cikutovich, permitted the U.S. Attorney to introduce hearsay testimony from Agent Pence. (ER 52-54). Before bringing the jury back into the courtroom, for an unclear reason to Petitioner, Judge Suko indicated that he was "not going to instruct on the shoe box." (ER 54). The jury was brought back into the courtroom, and no instruction to the jury, concerning the U.S. Attorney's introduction of the inadmissible evidence to the jury, was given by Judge Suko.

Petitioner submits that Judge Suko's corrective action was clearly warranted during the "trial by ambush," (ER 46), conduct by the U.S. Attorney. However, it is unclear to Petitioner as to why Judge Suko would allow the U.S. Attorney to engage in such conduct so prejudicial to the administration of justice, and prejudicial to Petitioner's right to a fair trial.

Another incident invoking section 455(a) and (b)(1) of Title 28 occurs during Judge Suko's ruling on Petitioner's Rule 29 Motion. Judge Suko incredibly finds that the "evidence [was] properly admitted at trial." (ER 55).

Petitioner submits that Judge Suko's findings ignore the trial facts. Judge Suko fails to take into account that, during trial, the U.S. Attorney, in order to gain a tactical advantage over Petitioner, deliberately violated the Federal Rules of Evidence.

In example, first, in addition to the introduction of the inadmissible shoebox, shoe, and Agent Pence's hearsay testimony, the U.S. Attorney introduced a document. (ER 56-

58). This document was not in evidence, and had not been disclosed to Mr. Cikutovich or the Court.

Also, over the repeated objections of Mr. Cikutovich, Judge Suko permitted the U.S. Attorney to introduce the testimony of Agent Mehring. (ER 59). Agent Mehring's trial testimony did not have a the foundation to testify to what Judge Suko permitted him to testify to.

Moreover, during trial, the U.S. Attorney by "trial by ambush" introduced a shoebox, a shoe, and Agent Pence's hearsay testimony. Judge Suko did not allow the use of the shoebox and the shoe, but allowed the government to further introduce as evidence the hearsay testimony of Agent Pence. Prior to trial, none of this evidence had been disclosed to the Mr. Cikutovich or the Court.

Additionally, the 'Expert Testimony' of Agent Pence, Forensic Chemist Krista Bernadt, and Spanish Interpreter Maria Amaya, was introduced at Petitioner's trial. Yet, under Rule 16 of the FRCrP, and under Rule 702, 703, and 705 of the Federal Rules of Evidence, no Daubert hearing was held, or a "written summary," as to the substance of any expert testimony that the U.S. Attorney intended to use, was submitted before these witnesses testified at trail with their expert testimony.

These events concern the admissibility of evidence related to evidence matters during trial, however, Judge Suko's findings, in Petitioner's Rule 29 Motion, are against trial facts. This is one other reason why Judge Suko's impartiality is open to the reasonable line of questioning.

Another instance that required Judge Suko to impartially exercise his discretion occurred during the Interpreter Ms. Amaya's highly prejudicial testimony. Again, during trial, by surprise, the U.S. Attorney elicited expert testimony from Ms. Amaya. Ms. Amaya's testimony was beyond her expertise. Mr. Cikutovich objected to Ms. Amaya's prejudicial testimony. (ER 60-61). The highly prejudicial event clearly warranted Judge Suko's intervention, to declare a mistrial or instruct the jury as to the present matter. Judge Suko, again, failed to take action, and Petitoiner's trial resumed leaving the injury to Petitioner, by Ms. Amaya's prejudicial testimony, undisturbed.

Petitioner submits that the conduct by Judge Suko clearly invoked section 455(a) and (b)(1) of Title 28.

Petitioner submits that a motion to recuse under § 455 requires only reasonable appearance of bias. Several Circuits have suggested that doubts about bias be resolved in favor of recusal. See, e.g., In re U.S., 158 F.3d 26, 30 (1st Cir. 1998) (although a challenged judge "enjoys a margin of discretion," doubts about whether actual or apparent bias exists "ordinarily ought to be resolved in favor of recusal"); Republic of Pan. v. Am. Tobacco Co., 217 F.3d 343, 347 (5th Cir. 2000) (if question of whether § 455(a) requires disqualification is close, balance tips in favor of recusal), rev'd on other grounds sub nom. Sao Paulo v. Am Tobacco Co., 535 U.S. 229 (2002); U.S. v. Dandy, 998 F.2d 1344, 1349 (6th Cir. 1993) ("Where the question is close, the judge must recuse himself."); Nichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995) (if question of whether § 455(a) requires

disqualification is close, balance tips in favor of recusal);
U.S. v. Patti, 337 F.3d 1317, 1321 (11th Cir. 2003)
("[D]oubts must be resolved in favor of recusal.")

The conduct by Judge Suko was demonstratively biased,
and it obviously reflected his willingness to assist the
prosecution in securing a conviction of Petitioner.

In sum, after Petitioner's trial, it became clear to
Petitioner that the animosity towards Petitioner was
emanating from Judge Suko. Judge Suko's repeated similarly
conduct, collectively and individually exhibited a pattern
impropriety and bias.

A handful of days, after judgment and sentence,
Petitioner anxious for review of what had occurred during the
pretrial, trial and post verdict phase, prematurely filed a
2255 motion under Title 28. As the record would reflect,
Petitioner frantically sought to obtain review the trial
proceedings through which the conviction in Petitioner's case
was obtained. Despite Petitioner's numerous claims, which
were made under penalty of perjury, and Judge Suko's fresh
knowledge of Petitioner's trial facts, Judge Suko denied
Petitioner's 2255 motion.

In ruling on Petitioner's 2255 motion, Judge Suko
completely ignored the trial facts, and stated that
Petitioner was "not entitled to an evidentiary hearing...."
The Court of Appeal for the Ninth Circuit Vacated and
Remanded with instructions to dismiss without prejudice
Petitioner's prematurely filed 2255 motion.

On late September, early October of 2006, Petitioner
made a monitored call from the monitored phone call system

located in Atwater USP, in Atwater, California, to his
Appellate Attorney, Karen Lindholdt, out of Spokane,
Washington. During that call, Ms. Lindholdt stated, "I think
your judge is in trouble." Immediately after Ms. Lindholdt's
statement, Petitioner commented about false evidence
presented at trial, and Ms. Lindholdt decided not to engage
any further with the conversation. During the conversation,
Ms. Lindholdt indicated to Petitioner that she did not wish
to proceed with the conversation, and that Petitioner should
contact his assigned corrections counselor to arrange for a
legal call. (ER 62-64). After that recorded phone call with
Ms. Lindholdt, Petitioner's letters to her were left without
response. (ER 65-66). Petitioner believes that Ms. Lindholdt
has knowledge to Judge Suko's impropriety and bias.

Petitioner submits that the fair trial guarantees of
the Due Process Clause of the Fifth Amendment encompass a
litigant's right to have "a neutral and detached judge"
preside over judicial proceedings. Ward v. Village of Monroe,
409 U.S. 57, 62 (1972). In this case, in addition to the
Constitutional guarantee, Petitioner invoked 28 U.S.C. §
455(a) and (b)(1), a statute which traces its antecedents to
1792. 13A Wright, Miller & Cooper, Federal Practice and
Procedure on Sec. 455(a) which, as amended in 1974, provides
as follows:

"Any justice, judge, or magistrate of the United
States shall disqualify himself/herself
in any proceeding in which his/her impartiality
might reasonably be questioned."

See also, Comment "Questioning the Impartiality of Judges:

Disqualifying Federal District Court Judge Under 28 U.S.C. Sec. 455(a)," 60 Temple L.Q. 697, 701 n. 30 (1987).

Thus, by this Court's action, Petitioner was not only denied a fair trial guaranteed by the Sixth Amendment to the United States Constitution, Petitioner was also prejudiced by its assistance to the prosecution in withholding the facts from the jury. It did so by, in the first instance, allowing the prosecution to mislead the jury with testimony know to be false.

After experiencing and learning of Judge Suko's manifested impartiality and bias, Petitioner, with limited law library resources to cite precise controlling authority, on December 27, 2006, file a Complaint of Judicial Misconduct: Complaint No. 07-89015 at the United States Court of Appeals for the Ninth Circuit. (ER 67-69). Petitioner's Judicial Misconduct Complaint was denied on March 14, 2007. (ER 70-73). On April 4, 2007, Petitioner filed a Petitioner for Review to the Judicial Council. (ER 74-76). On May 21, 2007, the Judicial Council for the Ninth Circuit filed an Order affirming the March 14, 2007 decision. (ER 77).

Petitioner submits that the filing of a Judicial Misconduct Complaint against Judge Suko has, nevertheless, created a conflict.

For the above reasons, Petitioner moves this Honorable Court to Grant Petitioner leave to proceed before a different Judge; a Judge whose impartiality is not open to any reasonable questions pursuant to Title 28 U.S.C. § 455(a) and (b)(1).

Petitioner declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my ability.

SUBSCRIBED AND SWORN

to before me this _____ day of December, 2008.

*SEE Below*

_____ Notary Public in and for the State of

_____, residing at _____ (Printed

Name of Notary) My Commission expires: _____

*Raul S. Zavala,* pro se

Reg.No. 11174-085

## CERTIFICATE OF SERVICE

I, Raul S. Zavala, hereby certifies and declares under penalty of perjury (28 U.S.C. § 1746), that three "Motions for Recusal" have been mailed by placing said Motion in a sealed envelope, with sufficient first-class postage affixed thereto, addressed to: United States District Court for the Eastern District of Washington, P.O. Box 1493, Spokane, Washington 99210. And by personally delivering such to prison mailroom officials, for delivery to U.S. Postal Service authorities.

DATED on this 7th day of December, 2008.

NAME *C. Uvag / chm. P* TITLE *CASE MGR.*

AUTHORIZED BY THE ACT OF JULY 7, 1955.
AS AMENDED, TO
ADMINISTER OATHS (18 USC 4004).

Raul S. Zavala

Petitioner: Raul S. Zavala, Reg. No. 11174-085

Address: United States Penitentiary Atwater

1 Federal Way/P.O. Box 019001

Atwater, California 95301

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 22 2008

JAMES R. LARSEN, CLERK
_____ DEPUTY
RICHLAND, WASHINGTON

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Raul S. Zavala, | EXCERPTS OF RECORD |
| Petitioner-Defendant, | FOR |
| | MOTION FOR RECUSAL |
| -vs- | 28 U.S.C. § 455(a) and (b)(1) |
| | (Honorable Judge Lonny R. Suko: |
| UNITED STATES OF AMERICA, | CR-05-00105-LRS) |
| Respondent-Plaintiff. | |

---

EXCERPTS OF RECORD

FOR

MOTION FOR RECUSAL

ER: 1 - 77

### b. Mr. Zavala Attempted to Make a Record at Sentencing Regarding Ineffective Assistance of Counsel and Irregularities in the Proceedings.

As stated in Mr. Zavala's Opening Brief, there are numerous other issues regarding ineffective assistance of counsel that defendant Zavala has raised in his 28 U.S.C. § 2255 Motion. Those issues are not fleshed out in the record and therefore are not yet ripe for review. Appellant's Opening Brief at 38. However, as stated in his Opening Brief, Mr. Zavala *attempted* to communicate with the trial court regarding the hurdles he faced to present a defense. At the April 18, 2006 sentencing defendant Zavala stated the following:

> "Okay. Thank you, Your Honor. First of all, I would like to say that I was interrogated by the government agents and the prosecutor. I was threatened. And he told me that I wasn't – I was not going to do no suppression hearings. I wasn't going to take it to trial or file no motions. I was going to get life. I was interrogated in front of – I think it was the Spokane police chief. And the Spokane police chief told me that he doesn't really care that – if I die in prison. And I think there were other homicide detectives there. Government agents were there. And Aine told me straight up on my face – he even leaned on his chair and told me: If you do any – if you file any motions for the suppression hearing – that he's going to give me life automatically."

Appellant's SER 1-19 (Sentencing dated April 18, 2006, pages 9-10).

The language used by Mr. Zavala at sentencing suggests that his case was not properly tried due to irregularities in the proceedings. Although this type of evidence is very limited in the record, it demonstrates Mr. Zavala's

ER 1

attempting to express his concerns about his right to a fair trial and the

substantial assistance process.

In response to Mr. Zavala's statements the U.S. Attorney made the

following statement:

> "The defendant was interviewed four times, separately, in an offer to
> cooperate. And on each occasion, the defendant refused to cooperate.
> He was interviewed by a Detective Kip Hollenbeck from I believe the
> Spokane County Sheriff's Office – he may work for the SPD, Your
> honor; but I believe it was Spokane County – in his connection to
> another case, and – where two independent witnesses put Mr. Zavala
> in connection to a case."

Appellant's SER at 12.

In response to the statements made by the U.S. Attorney at sentencing,

Mr. Zavala's counsel made the following statement:

> "Your honor, if I may, I guess I need to put on the record just as a
> response to the government's – the government indicated that Mr.
> Zavala had met with a Kip Hollenbeck from the state, one of the state
> detectives with regard – I think he's a homicide detective. And that's
> true, and he did. And he did meet with him in front of his attorney,
> with his attorney present at all times – myself.
>
> However, he was told and I was told if he'd like to speak with Mr.
> Hollenbeck, it has nothing to do with an agreement with the
> government. The government was offering Mr. Zavala's deal. And
> they said: However, there's a detective here that has nothing to do
> with us. You can speak with him, if you wish; or you can not speak
> with him. He did listen – Mr. Zavala listened to Mr. Hollenbeck; and
> Mr. Hollenbeck was asking him, Mr. Zavala for information. Mr.
> Zavala said: I'm not going to help you. And it was at that point when
> the government says: Well, now any deal that we had is gone if you're
> not going to help Mr. Hollenbeck. And the reasons I bring that up is
> because the government indicated that this did occur, and I needed to

ER 2

put on the record exactly what did occur. And so any agreement and any trust that Mr. Zavala had with the government at that point was gone, because, in effect, the word and the agreement was broken – that, in fact, this has nothing to do with us; and then 10, 20 minutes later, it had everything to do with any agreement with the government. So that may have something to do with Mr. Zavala's refusal to cooperate and lack of trust for the government's side."

Appellant's SER 16-17.

In sum, the transcript from Mr. Zavala's sentencing hearing dated April 18, 2006, demonstrates that Mr. Zavala had attempted to articulate his concerns about the way in which the substantial assistance talks proceeded. The record also demonstrates that Mr. Zavala met four different times with the U.S. Government in an attempt to gain a substantial assistance recommendation from the Government. What is not in the record, is why this process failed.

As this Court stated in <u>United States of America v. Leonti</u>, 326 F.3d 1111, 1117-1119 (9th Cir. 2003),

> The plea proceeding is a critical stage. See <u>United States v. Fuller, 941 F.2d 993, 995 (9th Cir.1991)</u>; <u>Akins, 276 F.3d at 1146</u>. We have therefore found ineffective assistance of counsel in cases where an attorney's failures concerned the process of plea bargaining and reaching the plea agreement. In <u>United States v. Blaylock</u>, we held that the failure to communicate a plea offer to a defendant is ineffective assistance. <u>20 F.3d at 1465-66;</u> see also <u>United States v. Rivera-Sanchez, 222 F.3d 1057, 1060- 61 (9th Cir.2000)</u> (holding that counsel is required to communicate the terms of a plea offer to a defendant, and to ensure that the defendant understands the terms of the offer and its significance).

ER 3

....

If it is ineffective assistance to fail to inform a client of a plea bargain, it is equally ineffective to fail to advise a client to enter a plea bargain when it is clearly in the client's best interest. See <u>Boria v. Keane, 99 F.3d 492, 497 (2d Cir.1996)</u> (examining counsel's failure to advise client of wisdom of accepting a plea). Therefore, Leonti will state a claim under the Sixth Amendment if Kaplan's conduct in delaying Leonti's plea was "outside the wide range of professionally competent assistance." <u>Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)</u>.

....

The focused question presented here is whether an ineffective assistance claim can arise out of an attorney's failure to properly assist a defendant in cooperating with the government. We conclude that the profound effect a substantial assistance motion can have on a defendant's sentence qualifies the cooperation period as a "critical stage" of the criminal process.

<u>United States v. Leonti</u>, 326 F.3d at 1117-1119.

## CONCLUSION

Defendant respectfully requests that this Court reverse the conviction and sentence below and remand with instructions for a new trial.

DATED this 20th day of November, 2006.

*Karen Lindholdt*

Karen S. Lindholdt, P.S.
Attorney at Law
423 W. First Avenue, Suite 240
Spokane, WA 99201
Telephone: (509) 744-1100
Facsimile: (509) 838-5155

Attorney for Appellant-Defendant

ER 4

Inmate's Name: **Zavala** _Last Name_  **Rawl** _First Name_  **Sanchez** _Middle Initial_

Module/Cell: **5W12**  Date **7-8-05** **48w**

Notes: _____

Prior Visits: _____

| DATE | TIME | VISITOR'S NAME | VISITOR'S ADDRESS STREET/TOWN/STATE/ZIP CODE | RELATIONSHIP | OFFICE USE ONLY |
|------|------|----------------|----------------------------------------------|--------------|------------------|
| 9-05 | 1345 | Rodolfo Zavala | 4818 N Crestline 99208 | Brother | 2 |
| 7-05 | 1345 | Lindsay Steele | 2105 W Boone 99201 | girlfriend |  |
| 1205 | 1325 | Rodolfo Zavala | 4818 N Crestline 99208 | Brother Q |  |
|  |  | Frank Cikutovic | 1406 B-Vary | AM |  |
| 605 | 1330 | Lindsay Steele | 2105 W Boone 99201 | girlfriend |  |
|  |  | Irene Zavala | 707 E Garland 99207 | Sister |  |
|  |  | Rodolfo Zavala | 4818 N Crestline 99208 | Brother 1 |  |
|  |  | Reynaldo Zavala | 1628 E Desmet | Brother |  |
| 805 | 1426 | Lindsay Steele | 2105 W Boone 99201 | girlfriend 2 |  |
|  |  | Rodolfo Zavala | 4818 N Crestline 99208 | Brother 2 |  |
| 2105 | 1330 | Lindsay Steele | 2105 W Boone 99201 | girlfriend |  |
|  |  | Irene Zavala | 707 E Garland 99207 | Sister |  |
|  |  | Rodolfo Zavala | 4818 N Crestline 99208 | Brother |  |
| 2305 | 1345 | Lindsay Steele | 2105 W Boone 99201 | girlfriend |  |

F1312  rev09/03

ER 5

158
8-12-05

INTERVIEW 2W SWT2 ZAVALA          BACK  1440

OUT 1350  SW31 ████████          BACK  1400
          SW40 ████████          BACK  1400

COURT SWT2 ████████              BACK  1655

1520 = SW16 ████████████         BACK FROM SURGERY

ROUNDS: 1530,

NOTE: SWEST IS STILL ON 1/4 OUTS. SWEST DOESN'T
KNOW HOW TO LOCK DOWN ON TIME.
I/M'S FROM ALL 4 SECTIONS WERE LATE L/D.
DUE TO 1/4 OUTS. (DISCIPLINARY) LOG ALL
PROBLEMS ON SWEST.                    CANO 1144

8-12-05 / 1800-2200 BOWMAN 953 on S, AAS Count SW=73

NOTE: AS I CAME ON DUTY ON S, SWEST COULD BE
HEARD YELLING AND SCREAMING all the WAY ON SE.

Rounds; 1835, 1945, 2020, 2055 med pass
2205

2230-0830 STEVENSON #496. All secure. All
in order. Physical count is 72.
Rd 2300, 2353, 0110, 0216, 0315, 0412, 0520
0600 Breakfast, 0705, 0750

8-13-05 / 0830-1750 Bowman 953 on S/SW AAS Count 72
              1D-4DS
Rounds 0850, 0920, 1007

NOTE ████████████████ SW31 TOLD ME HE AND HIS
0950 ROOMMATE WERE NOT GETTING ALONG AND HE NEEDS
TO BE MOVED. GROOMS NOTIFIED. SAID HE'LL MOVE HIM

ER 6

1   Q    No.  That's not my question.  I'm saying:  Did you get any

2   information from the confidential source of where drugs or

3   money are going to be that was then corroborated?

4   A    I don't remember debriefing or talking to the confidential

5   source about that specific instance.  No.

6   Q    Okay.  Now, you were asked again about the transcripts and

7   listening to the transcripts (sic).  Who did you listen to the

8   transcripts with?

9   A    Myself and Special Agent Rodney Weeks (phonetic), and also

10  the person who was cooperating with us.

11  Q    Is that the only time you listened to the transcripts?

12  A    No.  As I said, I listened to the -- there is no

13  transcript.  In fact, it's just the audio.

14  Q    I apologize.  I wrote down "transcripts", which is my next

15  question.  Are there any transcripts of the audio?

16  A    Not that I'm aware of.

17  Q    Okay.  And did you, in fact, review the audio yesterday?

18  A    Yes, I did.

19  Q    And who did you do that with?

20  A    Well, I listened to it on just two occasions -- once with

21  the person who is cooperating with us, and I listened to it

22  briefly with Special Agent Rodney Weeks.

23  Q    Okay.  So yesterday, you didn't listen to the audio with

24  two interpreters in the room?

25  A    No.  I only listened to a small portion of that    ER 7

1   conversation.

2   Q    Let's clarify. Yesterday, did you listen to the audio in

3   this case with two interpreters in the room?

4   A    Correct. And it was only a small portion of the actual

5   telephone call.

6   Q    You did; correct?

7   A    Yes. Only a few seconds of that.

8   Q    That's fine. Was there a problem understanding, either by

9   yourself or the people in the room, what was on the audio?

10   A    Yes.

11   Q    And, in fact, didn't the interpreter say to you: We can't

12   understand this thing -- a little short guy, about this big

13   (indicating)?

14   A    The individual you're referring to, Mr. LaVigne, did not

15   understand one word that I was aware of. I then went to the

16   person who was actually speaking on the phone and asked that

17   person what that word was.

18   Q    So you left the meeting yesterday with the interpreter,

19   who couldn't understand a word, and went to the confidential

20   source and said, gosh, what did you say on the tape?

21   A    Correct.

22   Q    And that's how -- that's what your testimony is about what

23   was on the tape?

24   A    Well, my testimony regarding that specific instance. Yes.

25   Q    Okay. Did you have the confidential source -- give him ER 8

| | | 11/01/2005) |
|---|---|---|
| 11/01/2005 | 62 | NOTICE OF HEARING ON MOTION: Oral Argument Requestedre 61 MOTION to Suppress *Based on Warrantless Search and Lack of Probable Cause*: as to Raul S Zavala Motion Hearing set for 11/8/2005 at 09:15 AM Spokane for 61 , before Judge Lonny R. Suko (Cikutovich, Frank) (Entered: 11/01/2005) |
| 11/02/2005 | 71 | Reserved for Court Use (CV, Case Administrator) (Entered: 11/09/2005) |
| 11/02/2005 | 72 | Reserved for Use by Court (CV, Case Administrator) (Entered: 11/09/2005) |
| 11/04/2005 | 63 | NOTI CE OF HEARING - By Court - Text entry; no PDF document - as to Raul S Zavala Pretrial Conference RESET for 11/8/2005 at **11:30 AM** in Spokane before Judge Lonny R. Suko. (LMM, Courtroom Deputy) (Entered: 11/04/2005) |
| 11/04/2005 | 64 | RESPONSE to Motion by USA re 61 MOTION to Suppress *Based on Warrantless Search and Lack of Probable Cause* as to Raul S Zavala. (Ahmed, Aine) (Entered: 11/04/2005) |
| 11/04/2005 | 65 | MOTION for Discovery by Raul S Zavala. (Cikutovich, Frank) (Entered: 11/04/2005) |
| 11/04/2005 | 66 | NOTICE OF HEARING ON MOTION: re 65 MOTION for Discovery: as to Raul S Zavala Motion Hearing set for 11/7/2005 at 06:30 PM for 65 , before Judge Lonny R. Suko (Cikutovich, Frank) (Entered: 11/04/2005) |
| 11/08/2005 | 67 | Minute Entry for proceedings held before Judge Lonny R. Suko:Pretrial Conference as to Raul S Zavala held on 11/8/2005, Suppression Hearing as to Raul S Zavala held on 11/8/2005, remainder of hearing set for 12/13/05 at 1:15 pm in Spokane. (Reported/Recorded by: Debra Clark) (LMM, Courtroom Deputy) Modified on 11/9/2005to replace PDF image. See Docket # 68 Docket Annotation re filing error/Minute Entry (LMM, Courtroom Deputy). (Entered: 11/09/2005) |
| 11/08/2005 | 70 | WAIVER of Speedy Trial by Raul S Zavala (CV, Case Administrator) (Entered: 11/09/2005) |
| 11/09/2005 | 68 | Docket Annotation - Re Filing Error: re 67 Minute Entry for Pretrial Conference and Suppression Hearing as to Raul S Zavala. Correct PDF attached to reflect new Pre-Trial Conference date of **1/10/06** at 9:45 am. (LMM, Courtroom Deputy) (Entered: 11/09/2005) |
| 11/09/2005 | 69 | ORDER CONTINUING SUPPRESSION HEARING AND TRIAL DATE as to Raul S Zavala; Granting Defendant's oral motion to continue trial; Granting 65 Motion for Discovery filed by Raul S Zavala; Suppression Hearing shall continue on **12/13/2005 01:15 PM in Spokane** before Judge Lonny R. Suko. Pretrial Conference is RESET for **1/10/2006 09:45 AM in Spokane** before Judge Lonny R. Suko. Jury trial date of 11/29/05 is STRICKEN and reset to **1/23/2006 01:00 PM in Spokane** before Judge Lonny R. Suko. EXCLUDABLE SPEEDY |

ER 9

### Rule 17.1. Pretrial Conference

On its own, or on a party's motion, the court may hold one or more pretrial conferences to promote a fair and expeditious trial. When a conference ends, the court must prepare and file a memorandum of any matters agreed to during the conference. The government may not use any statement made during the conference by the defendant or the defendant's attorney unless it is in writing and is signed by the defendant and the defendant's attorney.

(As added Feb. 28, 1966, eff. July 1, 1966; amended Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 29, 2002, eff. Dec. 1, 2002.)

## TITLE V. VENUE

### Rule 18. Place of Prosecution and Trial

Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

(As amended Feb. 28, 1966, eff. July 1, 1966; Apr. 30, 1979, eff. Aug. 1, 1979; Apr. 29, 2002, eff. Dec. 1, 2002.)

### Rule 19. [Reserved]

### Rule 20. Transfer for Plea and Sentence

**(a) Consent to Transfer.** A prosecution may be transferred from the district where the indictment or information is pending, or from which a warrant on a complaint has been issued, to the district where the defendant is arrested, held, or present if:

(1) the defendant states in writing a wish to plead guilty or nolo contendere and to waive trial in the district where the indictment, information, or complaint is pending, consents in writing to the court's disposing of the case in the transferee district, and files the statement in the transferee district; and

(2) the United States attorneys in both districts approve the transfer in writing.

**(b) Clerk's Duties.** After receiving the defendant's statement and the required approvals, the clerk where the indictment, information, or complaint is pending must send the file, or a certified copy, to the clerk in the transferee district.

**(c) Effect of a Not Guilty Plea.** If the defendant pleads not guilty after the case has been transferred under Rule 20(a), the clerk must return the papers to the court where the prosecution began, and that court must restore the proceeding to its docket. The defendant's statement that the defendant wished to plead guilty or nolo contendere is not, in any civil or criminal proceeding, admissible against the defendant.

**(d) Juveniles.**

(1) *Consent to Transfer.* A juvenile, as defined in 18 U.S.C. §5031, may be proceeded against as a juvenile delinquent in the district where the juvenile is arrested, held, or present if:

(A) the alleged offense that occurred in the other district is not punishable by death or life imprisonment;

(B) an attorney has advised the juvenile;

Final Pretrial Matters

1   court is aware, there is audio in this case of I think four

2   phone calls and we have received a prior transcript that we

3   have used at our other hearings, and I think Friday we

4   received a new transcript which seems to have a lot more words

5   in it and different words in it, and my anticipation is

6   because I have gone to Inland Audio Visual this weekend and

7   asked them to clarify the tape for me and they were unable to,

8   what I suspect has occurred is the person doing the

9   transcribing sat with the confidential informant and asked him

10  what is being said here, what is being said there, and if in

11  fact that is what occurred, that is hearsay.

12      The confidential informant can testify during the blank

13  periods what he think is being said, but for the transcriber

14  to write that down is just interpreting his hearsay.

15      So I don't know if that is what occurred because we are

16  in the dark, but if that is what occurred, I will be bringing

17  a motion that that new transcript should not be allowed as it

18  is hearsay.  Confidential informant can simply testify if he

19  can remember.

20          THE COURT:  I am wondering if that is a matter you

21  can discuss with Mr. Ahmed between now and then and see if you

22  can't come together for a procedure on handling that?

23      I think -- let me say that a little differently.  I think

24  if you can work that out to a satisfactory solution, it would

25  be to the benefit of both parties.  To argue in front of the

Final Pretrial Matters

1   heard, then she wouldn't have put it down on that piece of

2   paper.

3           MR. CIKUTOVICH:  If I could ask, it may clarify

4   things.  Has anything been done to the audio that she couldn't

5   hear last time that all of a sudden she can hear last week?

6           THE COURT:  In other words, has the audio been

7   enhanced in some fashion?

8           MR. CIKUTOVICH:  That is right, because it was

9   unintelligible before with the slang.  Has that been enhanced?

10  If not, we do have an issue.

11          MR. AHMED:  Well, Your Honor, the audio has not been

12  changed, but I would ask Mr. Cikutovich to question the

13  witness, I believe she can -- the witness will testify at

14  trial and Mr. Cikutovich can ask her specifically how she was

15  able to find those words.

16          THE COURT:  We may just simply have to have direct

17  and cross on all parties on that issue.

18          MR. AHMED:  Yes, Your Honor.

19          THE COURT:  So it is in front of the jury.  I don't

20  know how else we can handle that.  All right.  Let me go over

21  my notes momentarily.  I am assuming that the witnesses will

22  be sequestered?

23          MR. AHMED:  All except the case agent, Your Honor.

24          THE COURT:  All right.  And, Mr. Cikutovich, while

25  nobody has made the motion, I am assuming it will be a motion

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF WASHINGTON

3    ---------------------------------------------------------
                              )
4    UNITED STATES OF AMERICA,   ) Case No. CR 05-105-LRS-1
                              ) Date:   January 19, 2006
5                    Plaintiff, ) Spokane, Washington
                              )     Transcript of
6    vs.                        ) Pretrial Conference
                              )
7    RAUL S. ZAVALA,             )
                              )
8                    Defendant. )
     ---------------------------------------------------------
9

10              BEFORE THE HONORABLE LONNY R. SUKO

11   Appearances:

12   For the Plaintiff:          Mr. Aine Ahmed
                                 Assistant US Attorney
13                               US Courthouse
                                 W. 920 Riverside
14                               Spokane, Washington 99201

15

16   For the Defendant:          Mr. Frank L. Cikutovich
                                 Attorney at Law
17                               1408 W. Broadway Avenue
                                 Spokane, Washington 99201

18

19   OFFICIAL COURT REPORTER:    Mr. Topper S. Baker, RPR, CSR
                                 US Courthouse, 9th Floor
20                               W. 920 Riverside
                                 Spokane, Washington 99201
21                               Phone: (509) 458-3534

22       (Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription)
23

24

25

1    (Thursday, January 19th, 2006, 4:15 p.m., in open court

2   with counsel present via telephonic hearing, defendant absent,

3   for the following record:)

4        THE COURT:  Good afternoon, counsel.  This case is,

5   of course, the case of United States versus Raul Zavala, cause

6   number CR 05-105-LRS.

7    We are set for trial on Monday of next week.  I had

8   received word through the clerk's office that there may be a

9   problem that has developed involving a possible conflict of

10  interest, Mr. Cikutovich.

11       MR. CIKUTOVICH:  Yes, Your Honor.  This is Frank

12  Cikutovich.

13   As the court knows, I was in Yakima this morning and I

14  returned to my office sometime this afternoon, approximately

15  two o'clock this afternoon, and I received a fax from the

16  United States, the US Attorney on this case, which indicates

17  that in addition to the confidential source that we were aware

18  of, there would be another confidential source used and will be

19  testifying in the trial and that name was disclosed.

20   Once I saw this, firstly, I was surprised that the

21  confidential source has been disclosed at this time.

22   And secondly, I would argue that the confidential source's

23  testimony is not material nor relevant to the crime that is

24  charged.

25   And thirdly, and finally, the confidential source, his

1  name struck me so I pulled my old case files and I had met with

2  the confidential source in January of '04 -- in actually

3  December of '03 in anticipation of charges that were to be

4  filed against him.

5      We established an attorney-client relationship and when

6  charges were ultimately filed, I did not represent him in

7  court, but I did represent him prior to the charges being

8  brought against him.

9          THE COURT:  Did you learn confidential information

10  from him?

11          MR. CIKUTOVICH:  Well, I do have confidential

12  information, but in the time that I received this fax, I have

13  run over to the court and pulled the court file, and the

14  affidavit of probable cause that was filed in the court file

15  seems to indicate everything the client said to me when I was

16  representing him.

17      I am going to have to reflect and have some more time to

18  think about it.  I am not sure if he told me any more things or

19  not just because of the time constraints, Your Honor, but he

20  did disclose secrets to me.

21          THE COURT:  Have you had a chance to discuss this

22  development with the defendant in this case?

23          MR. CIKUTOVICH:  Not with the defendant, nor with the

24  confidential source's attorney.  We literally got back from

25  Yakima and I have done a plea and a sentencing and pulled this

1  file and that is all I have had time to do.

2          THE COURT:  That is certainly understandable.  I

3  don't mean to imply that you had any time to do anything

4  additional.

5      Mr. Ahmed, is this a witness that you really need?

6          MR. AHMED:  Your Honor, this is a witness that I did

7  notify defense counsel about actually back on January 12th,

8  approximately over a week ago, of his existence.

9      I provided an NCIC on him.  I provided any Gigglio

10  (phonetic) material that I had on him and I actually gave Mr.

11  Cikutovich his name on the 12th of January.

12      This is a witness that would testify that he has dealt

13  with the defendant before on prior occasions.  That he has

14  picked up money from him on numerous occasions.

15      At least four occasions where he picked up 5 to 8,000

16  dollars in cash.  That he was aware of Mr. Zavala driving a

17  white Escalade, had seen him on at least five previous

18  occasions driving that vehicle and he knew that he was in the

19  business of dealing methamphetamine.  He is an important

20  witness, Your Honor.

21          THE COURT:  I am assuming that we are going to have

22  an issue here.  Of course, waivers can in appropriate cases be

23  granted, but I am assuming in a case of this nature, the

24  defendant is going to be reluctant to waive, or at least may

25  be.

1    Do you know whether the confidential informant has any

2  concern about waiver of privilege, Mr. Ahmed?

3    MR. AHMED: Your Honor, I asked the confidential

4  informant specifically about Mr. Cikutovich's representation in

5  the past.

6    He indicated to me that he had contacted Mr. Cikutovich to

7  represent him, and that Mr. Cikutovich had informed him that he

8  could not help him, therefore he sought other counsel.

9    Also, I would notify Your Honor that even if Mr.

10  Cikutovich represented him, which the defendant -- or Mr.

11  Zavala, Mr. Victor Zavala, said that he did not, this is an

12  issue where this was a possible, I believe it was -- it wasn't

13  child molestation, but inappropriate touching of a minor is

14  what he was charged with and convicted of.

15    So if Mr. Cikutovich's memory is different than from what

16  Mr. Zavala's is, I don't know what it is based on.

17    THE COURT: Mr. Cikutovich, I am wondering if we

18  really have a conflict under the circumstances?

19    MR. CIKUTOVICH: Your Honor, I have reviewed my notes

20  and the court file and I think when Victor Zavala was asked if

21  I represented him, the correct answer is no, I did not

22  represent him on his state charge of, I believe it is child

23  molestation of some sort.

24    However, prior to the charges, and the actual charges in

25  Superior Court, I did represent him and I was helping him with

1 -- and I am looking at my notes with specifics, with people

2 that he had -- classes he had to go to and I think it was CPS

3 and we were trying to help negotiate some sort of settlement

4 with CPS and avoid charges in Superior Court.

5      So I think if you asked him literally did I represent him,

6 he would say no because he had David Hearrean as his attorney

7 in the criminal charges, but he was my client prior to the

8 criminal charges and an attorney-client relationship was

9 established.

10      THE COURT:  Mr. Ahmed, let me ask this, you have got

11 another confidential informant, can you obtain most of this

12 information from the other confidential informant?

13      MR. AHMED:  I could, Your Honor.  My concern is this,

14 if the court allows me, what I could do is, I hadn't really

15 thought about this because Mr. Cikutovich called me about 15

16 minutes ago literally about this issue, I don't know what the

17 defendant is going to say or as far as what his defense is

18 going to be, but my concern is that he says he gets up on the

19 stand or somebody gets up on the stand and says, oh, he doesn't

20 deal in methamphetamine and he didn't know what was in that

21 Nike shoe box.

22      I have to have somebody besides just one -- I mean,

23 obviously two witnesses are better than one, two individuals

24 showing that Mr. Zavala, the defendant, dealt in

25 methamphetamine.

1      THE COURT:  Well, does the other witness have the

2 same extensive knowledge that this witness would on that topic?

3      MR. AHMED:  Yes, Your Honor.

4      THE COURT:  In other words, they would both

5 essentially testify to the same issue?

6      MR. AHMED:  Well, as far as his dealing in

7 methamphetamine, yes, Your Honor.  I mean, Victor Zavala did

8 not trade methamphetamine or cocaine with the defendant.  He

9 basically collected money.

10    Now, he would also be able to identify that Victor -- or

11 the defendant Zavala, drove that white Escalade on at least

12 five previous occasions.

13      THE COURT:  Where drugs were dealt with?

14      MR. AHMED:  Right.  Well, I mean, he could identify

15 him as the person who drove that vehicle.

16      THE COURT:  In other words, he had ongoing dominion

17 and control?

18      MR. AHMED:  Right, Your Honor, and that was the

19 vehicle that he was arrested in.

20    My concern is that the defendant Zavala will claim it is

21 not my vehicle, which it is not registered in his name, it is

22 registered in a female's name, and I did not know that Nike

23 shoe box contained methamphetamine.

24    Now, I don't believe Mr. Zavala could even be impeached on

25 that inappropriate touching.  I mean, we are not dealing with

1  an issue of truth or dishonesty matters here.  My recollection

2  is it was a misdemeanor conviction.

3          THE COURT:  Mr. Cikutovich, any further?

4          MR. CIKUTOVICH:  I am looking at the judgment and

5  sentence and it is an assault on a child in the third degree

6  with sexual motivation.

7      I am not sure if it is a felony or not, but it is on

8  felony paperwork in the Superior Court and it has got the

9  felony fines associated with it.

10          THE COURT:  Well, here is what I have in mind.  I

11  think we need to iron this out before the weekend.  It is 4:25

12  now.

13      I am wondering if we shouldn't have this matter continued

14  for a phone conference tomorrow.  Gentlemen, what kind of a day

15  have you got; what are you looking at?

16          MR. CIKUTOVICH:  Your Honor, I have witness

17  interviews at 10 and 11 o'clock on another federal case and so

18  we will be done at noon and then I am free.

19          THE COURT:  What if we set this up at two o'clock

20  tomorrow afternoon, although I need to check because I have

21  matters going on all morning?

22      Hold on a minute, I will ask Laurie.  Does two o'clock in

23  the afternoon meet everybody's need?

24          MR. AHMED:  Yes, Your Honor, for the United States.

25          MR. CIKUTOVICH:  Yes, Your Honor, Mr. Cikutovich.

1    THE COURT:  I could do it earlier in the morning, but

2  my concern is you may need to discuss this among yourselves and

3  possibly come up with a solution.

4    It seems to me that there is technically a conflict, but

5  whether it is a real conflict is a little bit closer question.

6    I do think Mr. Cikutovich would have the absolute

7  obligation to cross-examine this witness using every possible

8  line of attack that he could legitimately use, and I am real

9  concerned about having the matter go forward in the current

10  posture without this being resolved.

11    So I am not even sure under the circumstances whether a

12  waiver would totally answer the question, and I am not sure

13  whether Mr. Cikutovich's client, given the seriousness of the

14  charges, is likely to consider a waiver, which means we may be

15  having to take a look at alternate representation.

16    Do either of you have any additional thoughts that I

17  should be mulling over?

18    MR. AHMED:  Well, Your Honor, I am going to try to --

19  this is Aine Ahmed.  I am going to try to determine what that

20  conviction was for, but I am looking at Rule 609, and the court

21  would have to determine under 609 whether the probative value

22  of the evidence outweighs its prejudicial -- well, that is as

23  to the accused, but evidence that any witness has been

24  convicted of a crime of dishonesty or false statement --

25    MR. CIKUTOVICH:  I just don't know if this gets

1  around -- this is Mr. Cikutovich, if that gets around any

2  confidences that I currently have.

3     I would have to tell Raul Zavala to see if we could

4  potentially use that in cross-examination, and as far as Victor

5  is concerned, he doesn't want me to tell anybody.

6        THE COURT:  Well, so that -- okay.  All right.

7  Gentlemen, I think the other question that I have is since we

8  are going to be dealing with this, should we be bringing, and I

9  suspect that we probably should, we probably should arrange to

10  have the client available in court so that he can listen to

11  this discussion.

12        MR. CIKUTOVICH:  I agree, Your Honor.  This is Mr.

13  Cikutovich.

14        THE COURT:  I am going to ask the -- we will attempt

15  to have the marshal bring the defendant to one of the

16  courtrooms tomorrow.

17     We will have to get back on the line either later today or

18  the first thing in the morning to tell you where to be, but we

19  will ask the marshal in Spokane -- where is the client, I

20  assume he is in Spokane?

21        MR. CIKUTOVICH:  He is in Spokane, Your Honor.

22        THE COURT:  We will ask them to bring him to court at

23  two o'clock, wherever this matter is going to be held.

24     In the meantime, I would ask that you discuss with him

25  fully the ramifications and the alternatives.

1    I am concerned about the conflict issue. I don't know
2 that I have settled my mind about whether there is a true
3 conflict.

4    I am concerned though given the seriousness of this charge
5 and the fact that your knowledge of a confidential informant
6 involves matters that probably consists of information that
7 goes beyond that which can be found in the public record.

8    The other issue I suppose is whether or not there is any
9 other way to get around this. It may be that the two of you
10 may find a way to stipulate, but again, that is going to
11 require the consent of the defendant.

12    We will see you tomorrow afternoon. I don't know what
13 else to tell you at this juncture. If we end up with a
14 conflict that we can't remediate, I will tell you that this
15 case is going to get continued, and I expect, Mr. Cikutovich,
16 you probably would be precluded from representing either party
17 and we would have to start over from the standpoint of counsel.

18    MR. AHMED: Okay, Your Honor. And if I could just
19 tell Mr. Cikutovich while I have him on the line, if he could
20 contact me after the conference call, we could talk about it.

21    MR. CIKUTOVICH: I will, Your Honor.

22    THE COURT: All right. Hang on one moment. We can
23 tell you already which courtroom we are going to be using
24 tomorrow, that will be Judge Quackenbush's courtroom at two
25 o'clock.

1    And, Mr. Ahmed, are you still there?

2         MR. AHMED:  Yes, Your Honor.

3         THE COURT:  Let's make arrangements to have the

4    defendant present.

5         MR. AHMED:  Yes, Your Honor.

6         THE COURT:  And actually my court clerk on this end

7    will make that arrangement, so we will relieve you of that.  In

8    the meantime, of course, I am assuming Mr. Cikutovich will have

9    a full opportunity to talk with his client.

10        Gentlemen, thank you very much.  I appreciate you being

11   available on short notice.  We certainly have to have this

12   problem ironed out.

13        I will hit the release button.  Thank you all and thank

14   you, Mr. Baker, for being present to report.

15        (WHEREUPON, court adjourned for the day regarding this

16   matter)

17

18

19

20

21

22

23

24

25

Volume 3

(Wednesday, January 25, 2006; in open court with defendant, interpreter and counsel present for the following record outside of the jury's presence:)

THE COURT:  I had understood that there was a request to have a conference before we bring the jury in.

MR. AHMED:  Yes, Your Honor, actually, I indicated to the clerk there was one issue, there are actually two.

The first issue is obviously the United States is not going to call Victor Zavala because the conflict -- the attorney/client conflict that could affect the defendant by Mr. Cikutovich's prior representation of Mr. Zavala, however limited that may have been.

Because it may become a question in the jury's mind why the government did not call Mr. Zavala in the case, especially because there has been testimony that Mr. Zavala was arrested at the same time that Mr. Partida was, I would ask that the court consider giving an instruction that through no fault of the government or the defendant, Mr. Zavala was not called, not because of any negative court rulings or anything like that, or any fault of the government or the defendant.

Now, I could style it better than that for the court to read it to the jury, however, I would like that instruction read because I don't want a question in the jury's mind as to why Mr. Zavala didn't testify.

Topper S. Baker, CSR, RPR
Spokane, Washington

1    THE COURT:  Actually, the testimony on him was very

2  limited, he was in a room next door.  His participation was

3  virtually nil.

4    MR. AHMED:  Well, Your Honor, I plan on expanding on

5  that testimony through officer Pence's testimony that Mr.

6  Zavala was arrested at the same time, and I want to reflect to

7  the court, I believe officer Pence will testify that actually

8  when I went down there, they were together in the same room

9  debriefed at the same time by myself.

10    That they during the phone calls, corroboration was taken

11  from Mr. Zavala, Victor Zavala, about individuals that they

12  were dealing with, not only the defendant but other

13  individuals.

14    THE COURT:  Let me ask you, you are not intending to

15  put that into evidence, that corroboration was obtained from

16  Victor Zavala?

17    MR. AHMED:  Well, I am going to say -- I am going to

18  ask officer Pence that did he also go to Victor Zavala and

19  attempt to corroborate that information.

20    THE COURT:  The problem -- I am just thinking out

21  loud.  My concern about that is if you have evidence that comes

22  in suggesting that Victor Zavala corroborated the government's

23  theory of the case, then it seems to me the fat is in the fire

24  because Victor Zavala potentially is a person who could be

25  called or should be called.

1   Given the status of the evidence at this juncture, I have

2   real concerns about that.

3   I am given -- we had a conference on this, of course, by

4   phone a week ago tomorrow on this exact topic.  I would be real

5   concerned about having a bunch of testimony about Victor Zavala

6   other than what is in there already.

7   MR. AHMED:  Okay.  Well, with that Your Honor, if I

8   don't talk about Victor Zavala, would you at least consider

9   giving that instruction?

10   THE COURT:  Well, I would consider it.  Have you and

11   Mr. Cikutovich talked about this?

12   MR. CIKUTOVICH:  No, we -- Your Honor, my opinion is

13   that it was just a mention of him and I don't think there is

14   any need to draw anymore attention to him.

15   I don't think there is a need for an instruction at this

16   point.

17   MR. AHMED:  Then if there is no instruction, Your

18   Honor, then I would state that on final argument, and I am not

19   accusing Mr. Cikutovich, but I have heard before why didn't

20   they call this individual, they had this individual, why didn't

21   they call him to corroborate Mr. Partida's testimony.

22   THE COURT:  Here is what I would suggest.  Rather

23   than an absolute ruling at this juncture, never knowing exactly

24   what the lay of the land is, I think we ought to take this up a

25   little bit later, but here is where I would come from.

1        I frankly think given the nature of the problem, that

2   there should be virtually no discussion of Mr. Zavala other

3   than the fact of arrest, that he was a codefendant, that that

4   matter is not before us.

5        And I would take real -- I will take real umbrage at the

6   prospect if we are going to argue at the time of final argument

7   why didn't the government call him, I think that is an improper

8   argument.

9        Now, whether we do an instruction on that is debatable.

10  The fear I have is if we do an instruction, it sort of draws

11  the attention to the concern that you are both expressing now.

12  If we simply don't mention him, he has really been a virtual

13  non player in the testimony thus far.

14       I did have some concern initially with Mr. Partida's

15  testimony, but I think he cleared up the fact that he was not a

16  participant in these phone calls, and I don't know that there

17  is any need or that there is anything that would be gained by

18  either the defense or prosecution by mentioning him at all.

19            MR. CIKUTOVICH:  I agree, Your Honor.

20            MR. AHMED:  Okay, Your Honor.

21            THE COURT:  And I would think that would mean staying

22  away from any issue about corroboration.

23            MR. AHMED:  Yes, Your Honor.

24            THE COURT:  Now, with regard to whether we do an

25  instruction, we can revisit that issue, but I am inclined to

1    The other -- as soon as I got this case and spoke with

2  Raul, and got 10 pages of discovery, something was wrong in the

3  case.

4    They had no warrant.  They never applied for a warrant.

5  And the only information they had was the description of the

6  vehicle, the time and the location.  That is it.

7    We do a hearing where the agent testifies under oath and

8  then on December 2nd after our hearing some seven months after

9  the event a report is made after meeting with the US Attorney

10  on the case.  Not based on notes, not speaking with the

11  officers.

12    Had that report not happened and we ended our hearing, we

13  wouldn't have had the benefit of knowing now this is what this

14  agent says he saw.

15    Apparently he got out of the car and walked away.

16  Apparently he tried to ram a vehicle.  No information until we

17  get this report generated a few weeks ago.

18    Is another report to come in February where I can go,

19  gosh, Raul, I wish we would have had this one before the

20  probable cause hearing and I wish we would have had this one

21  before your trial.

22    I have never seen an agent, seven, eight months later in

23  the middle of a probable cause hearing generate a report and

24  then it is different from the first report.  Why is that and

25  what is the difference?

1    When asked about specifics, did this really occur, well, I
2    didn't write that part of the report, although I signed it and
3    it says that I authored it.  That is the excuse.

4    It comes down to Raul Zavala's privacy interest, was there
5    probable cause to arrest him and subsequently search him.
6    Based on what they had, Your Honor, I don't think a Magistrate
7    would have ever signed an arrest or search warrant based on
8    that, and I have reviewed not near as many as you have, but I
9    have done it for 10 years and that should -- the reliability is
10   scant, it is not verified until afterwards, and you have got a
11   Mexican driving a car with spinners on it.  Boy, there is one,
12   let's get him.

13   Well, I don't think it would have been signed by a Judge
14   and I think that is the protections that we are afforded.  For
15   whatever reasons and in the haste that they had to hurry up and
16   get people.

17   Look what they did on Buchanan and Olivera.  They got a
18   picture, they got a criminal history, they verified with the
19   confidential source, look, oh, yeah, he is involved in drugs,
20   let's set up a deal, let's make the deal go through and wait
21   for the deal to go through.

22   First thing I said, why didn't they let the deal go
23   through if, in fact, that is what was going to happen.  That is
24   what you do, because then you can say we saw him deliver drugs
25   and you go arrest the individual.

ER 30

Mehring/Cross-Examination

1  accelerate backwards which was perceived as an attempt to flee,

2  is that right?

3  A.   Yes.

4  Q.   Now, is that what you --

5  A.   No, listen counselor --

6  Q.   No, no, I will ask you a question.  Is that what you

7  wrote?

8  A.   If you look at the report and read the entire thing, it is

9  a report written by myself and special agent Sullivan.  Those

10  observations are agent Sullivan's.

11  Q.   Okay.  So when you testified to what you just testified

12  to, they were not all your observations?

13  A.   That particular observation is agent Sullivan's.

14  Q.   Okay.  So when you made this report, did agent Sullivan

15  help you with it?

16  A.   Yes, he typed that part of that report.

17  Q.   And what did he use for his basis of knowledge?

18  A.   Well, you will have to ask him.

19  Q.   Did you see him type it?

20  A.   Yeah, he was sitting at my desk to type that part -- that

21  part of that report.

22  Q.   Was he reviewing notes?

23  A.   I don't recall.

24  Q.   So you never saw the white Escalade making any attempt to

25  flee, did you?

Mehring/Cross-Examination

1   A.   That is correct.

2   Q.   So now I just want to ask you what you knew prior to you

3   arresting him, okay?

4   A.   Okay.

5   Q.   You didn't know what was inside of the Nike box, correct?

6   A.   Nope.

7   Q.   Okay.   Now, did you write a report in this case?

8   A.   Yes.

9   Q.   When did you write your report?

10   A.   I wrote an additional report at the request of prosecution

11   a couple of weeks ago.

12   Q.   You say an additional report, did you write a first

13   report?

14   A.   No.   Under the federal system, as opposed to the state

15   system, incidents are generally written up by one individual as

16   opposed to every individual writing their own report, and that

17   is what was done in this case.

18   Q.   Do you know who wrote the initial report?

19   A.   It was deputy Jack Rosenthal.

20   Q.   Okay.   And do you know when he wrote that?

21   A.   It would have been shortly after the incident.

22   Q.   Have you reviewed that report?

23   A.   It has been a little while, but yes.

24   Q.   When you say a little while, is it fair to say it has been

25   at least months since you have looked at it?

Mehring/Cross-Examination

1  A.   No, I would say -- I think I reviewed it at a meeting that

2  we had a couple of weeks ago.

3  Q.   Okay.  Who were you meeting with?

4  A.   With Aine Ahmed.

5  Q.   And who else?

6  A.   I think officer Pence.

7  Q.   Is that it?

8  A.   That is all I recall, yeah.

9  Q.   Okay.  At this meeting, did you have the benefit of

10  looking at the transcripts from the beginning of this probable

11  cause hearing?

12  A.   No.

13  Q.   Were you given any information as to what occurred at the

14  first probable cause hearing?

15  A.   Not much, just conversation.  I know SA, or special agent

16  Cummings handled that.

17  Q.   So the only thing you were told is that he testified?

18  A.   Yeah.

19  Q.   Were you told any of the contents of the testimony?

20  A.   Nothing specifically.  I remember him commenting that he

21  had a hard time with some of the stuff because he didn't -- you

22  know, wasn't one of the main guys involved with this particular

23  incident.

24  Q.   Okay.  When you say he commented, who commented?

25  A.   Agent Cummings.

Mehring/Cross-Examination

1 Q. So he was present at your meeting as well?

2 A. No, I don't believe so, I think this is just office

3 conversation.

4 Q. Okay. So you had heard prior to your meeting with the US

5 Attorney on this case, office conversation about agent Cummings

6 not knowing much when he testified?

7 A. No, that is not accurate.

8 Q. Well, what is accurate?

9 A. What is accurate is what I said, is that the casual

10 conversation in the office. You asked me what I heard about

11 this case. I recall hearing officer -- or special agent

12 Cummings saying that he had some difficulties testifying

13 basically to stuff that would normally be testified to by

14 myself or officer Pence.

15 Q. Were you available in November of this year to testify at

16 that hearing?

17 A. No.

18 Q. Where were you?

19 A. Vacation.

20 Q. And you have not reviewed the testimony of agent Cummings?

21 A. No.

22 Q. Now, were you asked to prepare a report of investigation

23 in anticipation of this hearing?

24 A. Yes.

25 Q. And who asked you to do that?

1   A.   Aine Ahmed.

2   Q.   And was that at this meeting a couple of weeks ago?

3   A.   I am not positive.  It may have been or it may have been

4   sometime later, I am not sure.

5   Q.   Is it fair to say you were asked to prepare a report after

6   the beginning of this probable cause hearing?

7           MR. AHMED:  Objection, Your Honor.  How does this go

8   to probable cause again?  This is cross-examination for trial

9   and not for probable cause purposes.

10          THE COURT:  Sustained.

11  Q.   When did you write your report?

12  A.   Week or two ago.

13  Q.   Would December 2nd, '05 be the date you prepared the

14  report?

15  A.   If that is what it says, yes.

16  Q.   And have you had the opportunity to review the first

17  report by Jack Rosenthal?

18  A.   Yes.

19  Q.   Anything in that report that is inaccurate that needs to

20  be changed?

21  A.   Yes, that is why we wrote the additional report.  For one,

22  he had omitted some observations that we had, and that is about

23  it.

24  Q.   Okay.  Would the omissions be where the cell phones are

25  located?

1  months after the event?

2  A.   Well, typically the case doesn't typically even go to

3  court.

4  Q.   How many cases have you had since April 28th?

5  A.   That is hard because they don't go to conclusion within

6  that time frame.  I mean, I have worked on numerous cases since

7  then.

8  Q.   How many cases have you worked on?

9  A.   Oh, I don't know.  Cases involving everybody else in the

10  office or just my own?

11  Q.   Your own cases since April?

12  A.   Oh, probably a few.

13  Q.   Is that 10 or is that a hundred?

14  A.   It would be -- I don't know, three or four, five, I don't

15  know.

16  Q.   So you have done five cases since April?

17  A.   Well, I have worked on probably about five of my own cases

18  since April, probably worked on dozens of cases that are being

19  managed by other agents or officers in the task force.

20  Q.   Okay.  I am going to ask you about your December 2nd

21  report.  Who wrote the report?

22  A.   I wrote the report, until it came to a part where it went

23  into agent Sullivan's observations and then he wrote that

24  portion of the report.

25  Q.   Okay.  But you are the only one that signed it?

1   Q.   Okay.  Are you -- do you recollect sometime in December

2   having a meeting with Jay Mehring to discuss this case?

3   A.   Yes, I do.

4   Q.   And at that meeting, were you requested to write a report

5   by anybody?

6   A.   I was asked to sit with Jay and it was determined that Jay

7   would write the report, but I would provide my input as to what

8   I observed that day.

9   Q.   And who asked you to do that?

10  A.   That was at the direction of US -- Assistant US Attorney

11  Aine Ahmed.

12  Q.   And did Jay -- you told Jay what you remembered happened

13  and Jay sat down and typed it all out?

14  A.   Yes.

15  Q.   Did you do any typing?

16  A.   No.

17           MR. CIKUTOVICH:  Nothing further.

18           THE COURT:  Thank you, Mr. Cikutovich.  Mr. Ahmed.

19                    REDIRECT EXAMINATION

20  BY MR. AHMED:

21  Q.   Everything you informed Mr. -- or Jay Mehring, was that

22  accurate and true to the best of your recollection?

23  A.   Yes.

24  Q.   And did you tell agent Mehring -- you don't remember

25  typing that day, that is what you have indicated?

1    MR. CIKUTOVICH:  Objection, Your Honor, his answer

2  was he didn't type.

3  Q.    Did you type at that time?

4    MR. CIKUTOVICH:  Objection, asked and answered.

5    THE COURT:  Sustained, asked and answered.

6    MR. AHMED:  As to did you type it, Your Honor?

7    THE COURT:  That was asked before in the redirect --

8  recross -- in the cross, excuse me.

9  Q.    Okay.  The information you gave agent Mehring, what did

10  that pertain to?

11  A.    That pertained to my observations.

12  Q.    Okay.  And would that include the defendant backing his

13  vehicle up?

14  A.    Yes.

15  Q.    Okay.  And what you specifically observed?

16  A.    Yes.

17  Q.    So you and agent Mehring were sitting together at this

18  point?

19  A.    Yes.

20  Q.    Okay.

21  A.    I would have given him direction on what I observed and

22  what to put into the report, but my recollection is he was

23  sitting at the keyboard typing the report, however I was there

24  while he was typing it.

25  Q.    Okay.

1  confidential informant and you, quote, sign them up?

2  A.    Yes.

3  Q.    What does that mean when you sign up a confidential

4  informant?

5  A.    What that means is when you have a person, that is they

6  can be a defendant, but they are not in custody at that time,

7  we make a contract that they sign.

8      They can't do any crimes, a bunch of other stuff.  They

9  sign a contract and they get a confidential informant number.

10  Q.    And then in effect, he works for the government?

11  A.    That is correct.

12  Q.    And you have the discretion to not charge him with a crime

13  and hold it over his head while he works for you?

14  A.    That is correct.

15  Q.    And in this case, you didn't decide to do that, did you?

16  A.    No.

17  Q.    Now, with the female at the airport, I remember Mr.

18  Partida testifying yesterday, he didn't know who Rosa was, do

19  you remember that?

20  A.    Yep.

21  Q.    Is that true?

22  A.    No.

23  Q.    Okay.  Is it your understanding, although you are not sure

24  what the agreement was with the government, with Mr. Partida,

25  that Mr. Partida is supposed to tell you or the government

1  is"?

2  A.    I believe there was multiple things that we had issues on

3  translations --

4          MR. CIKUTOVICH:  Your Honor, it is a simple question.

5          THE COURT:  Let's repeat the question and then we

6  will have the answer.

7  Q.    You didn't hear him say, "I don't know who Rosa is"?

8  A.    Yes, I did.

9  Q.    In fact, within 15 minutes of him working for you, he told

10  you about a female coming to the airport, correct?

11  A.    Yes, he did.

12  Q.    And the female's purpose was to take money back to the LA

13  area, correct?

14  A.    That is correct.

15  Q.    And female has some sort of relationship with his

16  girlfriend in LA, isn't that right?

17  A.    That is correct.

18  Q.    But your testimony is you let this woman go without any

19  charges whatsoever knowing what she was doing and it had

20  nothing to do with the fact that Luis Partida was cooperating

21  with you?

22  A.    That is correct.

23  Q.    And who made that decision?

24  A.    Me and Mr. Ahmed.

25  Q.    Mr. Ahmed was involved in that?

ER 40


1  everything he knows about drug dealing?

2  A.    That is correct.

3  Q.    Okay.  You know that part of the agreement?

4  A.    Yes.

5  Q.    Okay.  And so did he tell you about Rosa?

6  A.    Yes, he did.

7  Q.    But yesterday in court in front of the jury, he said he

8  didn't know who she was.  Did you know he was lying at the

9  time?

10  A.    Yes.

11  Q.    So now has he violated this contract that he has with the

12  government to tell the truth all of the time, or is that not

13  part of the contract?

14  A.    Well, I believe he then testified that he did know her.

15  Q.    Kind of.

16  A.    So the -- I think the confusion was whether she was

17  involved in the narcotics trade and that is what his confusion

18  was.

19       I don't know, as far as at the time he told me she was

20  going to transport money, didn't know what it was for.

21  Q.    I will ask you the question again.  The fact that he lied

22  in court yesterday, does that violate his contract with the

23  government?

24  A.    I don't believe he lied.

25  Q.    Okay.  You didn't hear him say, "I don't know who Rosa

1    MR. AHMED:  Okay.  I didn't hear the question -- the

2  last question, Your Honor.  I would like an opportunity to talk

3  to the witness to make sure he understood the question.

4    MR. CIKUTOVICH:  Go ahead.

5    THE COURT:  Let's go ahead and do that.

6    MR. AHMED:  You want me to do it on the record?

7    THE COURT:  I think we better do it on the record

8  because certainly that is an area for significant

9  cross-examination.

10    MR. AHMED:  Okay.  Mr. Partida, whatever Mr.

11  Cikutovich asks you, you have got to tell the whole truth,

12  okay.

13    So if there is a question about Rosa, and whether she was

14  coming up here to get money, or if she has some sort of

15  personal relationship with you, then you need to tell him,

16  okay.  Do you remember a lady named Rosa?

17    THE WITNESS:  Yes.

18    MR. AHMED:  Did she ever collect money for you, or

19  take money down to California for you?

20    THE WITNESS:  About two times only.

21    MR. AHMED:  Okay.  And was that for controlled

22  substances?

23    THE COURT:  I am wondering --

24    THE WITNESS:  She didn't know.  She did not know

25  about it, she was not aware, because I had not told her.

1   Mr. Cikutovich wants to cross-examine him on that, fine, but my

2   understanding was that he was present in the same vicinity.

3          THE COURT:  My sense of this is that there is a

4   question he was present in the sense -- there is some testimony

5   that he was present.  We don't know how he was present, that is

6   basically the sum and substance of where we are at.  I think

7   that needs to be clarified.

8          MR. CIKUTOVICH:  I can, Your Honor --

9          THE COURT:  All right.

10         MR. CIKUTOVICH:  -- if I may.  Mr. Partida, when you

11  were making phone calls to Raul, do you remember that?

12         THE WITNESS:  Yes.

13         MR. CIKUTOVICH:  Where was Victor Zavala while you

14  were making the phone calls?

15         THE WITNESS:  He was separated in another room.

16  Closed.

17         MR. CIKUTOVICH:  Did you have the opportunity to talk

18  to Victor Zavala while you were making phone calls?

19         THE WITNESS:  No.

20         MR. CIKUTOVICH:  So you never talked with Victor

21  Zavala during the days that you were making phone calls to Raul

22  Zavala?

23         THE WITNESS:  No.

24         THE COURT:  I think that clears up the issue.

25         MR. CIKUTOVICH:  It does, Your Honor.

ER- ██████ -

1    THE COURT:  Let's take a 15 minute break and come

2    back at four o'clock.

3        (WHEREUPON, court recessed at this time)

4        (WHEREUPON, court reconvened after recess in the courtroom

5    and in the presence of the jury, court, counsel, defendant and

6    interpreter present for the following record:)

7        THE COURT:  Mr. Cikutovich, do you have any

8    additional questions?

9        MR. CIKUTOVICH:  Yes, thank you, Your Honor.

10        CROSS-EXAMINATION - CONTINUED

11   BY MR. CIKUTOVICH:

12   Q.   Mr. Partida-Ramariz, now you answered the question that

13   Rosa was in town to get a job, correct?

14   A.   Yes.

15   Q.   And she had nothing to do with drug dealing or with money,

16   correct?

17   A.   Yes.

18   Q.   That is not true, is it?

19   A.   I don't understand the question.

20   Q.   Okay.  It is not true that Rosa was in town to simply get

21   a job?

22   A.   She was only here to look for work here.

23   Q.   Is it true that you used Rosa to transport drug money?

24        THE INTERPRETER:  The interpreter would ask for

25   repetition, please.



1    not only to include his wallet, but also if you look at the

2    transcripts, Your Honor, the defendant, and I am paraphrasing

3    here, talks about not wanting to sit outside with that for too

4    long of a time.

5        That indicates that the defendant knew that he was in

6    possession of a controlled substance.

7        I would also point out, Your Honor, that there was

8    testimony given that on previous occasions, Luis Partida had

9    dealt in pounds of methamphetamine from Mr. Zavala.

10       THE COURT:  Thank you.  My ruling is as follows:

11       It seems to me looking at the evidence under Rule 29,

12   there, first of all, were phone calls to Raul, a person by the

13   name of Raul who was later, if the testimony is to be believed,

14   was the defendant.

15       Although the conversation was in code, looking at the

16   totality of what occurred at that time versus in addition to

17   that, what happened afterwards, that is, he drove a pearl white

18   Escalade to a prearranged location, he was arrested essentially

19   after he got out of the automobile.

20       The automobile had, in this case, a late model Cadillac

21   Escalade, had on the front seat or on the floor boards, one of

22   the two, a shoe box containing a significant amount of what

23   turns out to be drugs.

24       That, given the testimony of Luis Partida, seems to me

25   creates a significant amount of evidence which if the trier of

Topper S. Baker, CSR, RPR
Spokane, Washington

ER 45

ER-

1    MR. CIKUTOVICH:  Is this trial by ambush, Your Honor?

2    THE COURT:  Well, I am wondering where we are going

3  with this.

4    MR. CIKUTOVICH:  The US Attorney didn't have this

5  object before he started this testimony and he could have given

6  me the opportunity to look at it?

7    MR. AHMED:  We can ask officer Pence when he went and

8  got the shoe when he was instructed to.  This is not trial by

9  ambush.

10    MR. CIKUTOVICH:  When did he have this?  He couldn't

11  show this to me before he came out this morning?

12    THE COURT:  My concern about it is where are we going

13  with the testimony?  I assume the argument is going to be made

14  -- is it the government's theory that the shoe box was a 9 shoe

15  box, size 9?

16    MR. AHMED:  Yes, Your Honor.

17    THE COURT:  All right.  And that is in evidence it

18  seems to me.  What do we need the shoes for?

19    MR. AHMED:  To show that that is not his shoe box,

20  Your Honor.  I believe a comment was made during the course of

21  this trial -- or at least Mr. Partida actually testified --

22    MR. CIKUTOVICH:  That he wears a size 9.

23    MR. AHMED:  Right.

24    MR. CIKUTOVICH:  And the shoe box is a size 9.

25    MR. AHMED:  Right, Mexican size 9.

1    MR. CIKUTOVICH:  No, he did not say that, he said a
2  size 9.

3        THE COURT:  Hang on, gentlemen.  Here is my problem.
4  Isn't that already admitted, it is a size 9 shoe?  I mean, I
5  can tell you he didn't say Mexican size 9.  Based on the
6  translator's testimony, it was a 9.

7        MR. AHMED:  Okay.

8        THE COURT:  What do we need the shoes for and does it
9  -- go ahead.

10        MR. AHMED:  My alternative is to bring Mr. Partida
11  back because in asking him the question this morning what shoe
12  size do you wear, he informed officer Pence Spanish size 9.  I
13  mean, in Mexico it is size 9.

14        To corroborate that, we got -- he pulled his shoe off.  I
15  want to see your shoe.  It is size 10, United States size 10.
16  It says UK size 9, which is commonly used in Mexico size 9.

17        The shoe box says size 9, Nike shoe box, and it is clearly
18  written on the outside size 9.  Now, I am reacting
19  appropriately, you know, anticipating what is going to come
20  from the defense and this is not trial by ambush.  We pulled it
21  off his foot just a few minutes ago.

22        MR. CIKUTOVICH:  Before we started the trial or after
23  the jurors were here?  You didn't know about this before they
24  walked in?

25        MR. AHMED:  I knew about it before.

1    MR. CIKUTOVICH:  Then why didn't you show it to me so
2  I could inspect it and we wouldn't have to go through this?
3         THE COURT:  Assuming all this evidence, what is the
4  importance?
5         MR. AHMED:  Well, I don't want the jury to think that
6  this is his Nike shoe box, Your Honor.
7         THE COURT:  Don't want them to think what?
8         MR. AHMED:  That it was the Nike shoe box.
9         THE COURT:  That it was Partida's Nike shoe box?
10        MR. AHMED:  Right.
11        THE COURT:  At this juncture, however, it is
12  speculative either way.
13    I mean, the box says 9, he says his shoe size is 9.
14  Apparently that is in Mexican shoe size.  You are saying it is
15  United States size 10.
16    We don't know whether this shoe box contained these shoes,
17  some other shoes or whatever, so my concern about putting this
18  into evidence, doesn't it leave the jury totally into
19  speculation on that issue?
20    I mean, don't you inject issues that are not there?
21        MR. AHMED:  Well, he was asked on cross-examination,
22  Your Honor, what size shoe.  There is a reason he was asked
23  that.  Okay.
24    Now, common sense being that the shoe box says 9, you can
25  read 9 on it, okay, what I believe is going to happen here is

1   that defense is going to claim that they were Mr. Partida's

2   drugs because they came in a Nike shoe box that is the same

3   size.

4       Why shouldn't the United States be allowed to say well, he

5   doesn't wear a size 9 in the sense of a US size 9 because it is

6   a US Nike shoe box sitting there saying 9.  He wears US size

7   10.

8           THE COURT:  Do we know it is a US Nike shoe box?  At

9   this point the shoe box isn't in front of us.

10          MR. CIKUTOVICH:  We don't know anything, Judge.

11          MR. AHMED:  I would ask this, Your Honor, if there is

12  testimony that that is Mr. Partida's drugs, I be allowed to

13  cross-examine the defendant -- or excuse me, the witness and

14  bring this in at that time.

15          THE COURT:  It seems to me that that would be a

16  potentially more appropriate time to raise the issue.  My

17  concern about it is that at this point, that shoe box, we know

18  that there was a Nike shoe box if the testimony is to be

19  believed that these drugs were in.

20      We know that apparently it is a size 9 on the shoe box.

21  Apparently in Mexico, Mr. Partida's shoes are a size 9, but

22  they are a size 10 in the United States.

23          MR. CIKUTOVICH:  And I would not agree with that,

24  Your Honor.

25          THE COURT:  All right.

1    MR. CIKUTOVICH:  And I don't think there has been a

2  proper foundation to say that unless Mr. Pence is an expert

3  about buying shoes in Mexico.

4    THE COURT:  I am quoting Mr. Ahmed who is not here as

5  a witness.

6    MR. CIKUTOVICH:  I am saying I do not agree on that.

7    MR. AHMED:  I am basing that on what officer Pence

8  asked Mr. Partida this morning.

9    MR. CIKUTOVICH:  Mr. Partida says it is 10 in Mexico?

10    MR. AHMED:  Mr. Partida says it is a 9 in Mexico.

11    THE COURT:  And we don't know one way or the other.

12    MR. CIKUTOVICH:  We don't, and he could have been

13  asked that on direct yesterday.

14    THE COURT:  I think we need to stay clear of this at

15  this juncture.  If there is testimony that comes in or if there

16  is later argument on this, we will take a look at it.

17    My fear is you are putting in evidence -- or potentially

18  putting in evidence that creates issues that may or may not be

19  there, and I do think at this juncture if there is a reciprocal

20  discovery, this is an item that potentially needs to be

21  discussed in advance and I think we ought -- I think we can --

22  I am not inclined to let it go in at this juncture.

23    MR. AHMED:  I understand that, Your Honor, and I want

24  to address that trial by ambush.  There are reciprocal

25  discovery so when we are offered photographs that we have never

1    seen before, same applies, Rule 16 applies both ways.

2              THE COURT:  I agree.

3              MR. AHMED:  So if defense counsel does that to me,

4    you know, photographs, last second, presenting no offer as to

5    -- we have to produce reports, which by the way, Your Honor,

6    with all due respect, under the Jencks Act, I would dispute

7    whether those reports really come in under the Jencks Act, but

8    we produced them.  If there are going to be photographs, we

9    haven't seen a thing.

10             MR. CIKUTOVICH:  I have told you on the record what

11   we are going to be using and you had an opportunity to tell the

12   Judge that you had a box here with evidence in it and an

13   exhibit in it that you were going to show in front of the jury

14   without me ever seeing it.

15        I think the jurors need to be instructed that anything in

16   relation to this shoe needs to be stricken from the record.

17             THE COURT:  Gentlemen, let's bring this to a close.

18   I realize that heat of battle, both parties have duties that

19   have to be acquitted and have to be performed.  I don't think

20   we are gaining anything by continuing this discussion.

21        So here is what I am going to do.  I am going to sustain

22   the objection to the use of the shoe box and I am going to

23   simply tell the jury at this time that they will ignore the

24   question -- any questions that may have been asked previous to

25   this time concerning the shoe box.

1    We won't go any further than that unless there is some

2    reason in rebuttal or further presentation that would come in

3    at a later time.  It seems to me that preserves your objection.

4        MR. AHMED:  Yes, Your Honor.  I do object as far as

5    -- I would even agree, okay, we are not going to use the shoe

6    itself at this point, Your Honor.

7        His testimony that he went up there and checked his shoe

8    size, his US shoe size, that is something he could be

9    cross-examined about.

10       There is no reason that the court should give an

11   instruction not to regard that.  It happened.  He went up

12   there.  He went up there, he checked his shoe size.

13       If Mr. Cikutovich wants to cross-examines him and say do

14   you know what his Mexican shoe size is or US shoe size, he can

15   do that, but what should prevent the Unites States from going

16   and checking this man's shoe size?

17       It is not something preplanned.  He went up there.  He

18   testified he went up there this morning.

19       THE COURT:  I think, Mr. Cikutovich, that is a

20   reasonable approach.

21       MR. CIKUTOVICH:  I just don't see the relevance

22   determining a witness' shoe size on the day of trial has

23   anything to do with the case.  He was asked and he has answered

24   a question.  They are just trying to undo, that is what they

25   are doing.

1        THE COURT:  Here is the reason for the -- here is the

2  reason for it.  It came in yesterday on cross what the shoe

3  size was so it is now to some degree an issue in the case.

4       I think getting in what the shoe size is, based upon the

5  shoes he is wearing, is legitimate.  Using the shoes and

6  continuing on in that regard doesn't add a whole lot.  If

7  anything, it injects issues that aren't there.

8        MR. AHMED:  Yes, Your Honor.

9        THE COURT:  There also may, however, be questions

10  that we are going to be right back in it because apparently Mr.

11  Partida had indicated that the shoe size in Mexico is 9.

12        MR. AHMED:  That is what he said.

13        MR. CIKUTOVICH:  He didn't say Mexico.  I said what

14  is your shoe size and he said a 9.

15        THE COURT:  Yes, but the information that the

16  government proffers this morning is that apparently when he was

17  asked this morning, or whenever, and this is hearsay, of

18  course, it is not technically in front of us, but it is

19  information upon which this officer relied in part on bringing

20  this shoe in was that in Mexico it is a 9.  So potentially we

21  are going to get into that issue.

22        MR. CIKUTOVICH:  And considering that he has been

23  apparently interviewed or talked to, which is why we still have

24  him reserved and may be calling him back, Mr. Partida.

25        THE COURT:  All right.  Here is what I am going to

1   do.  I am not going to instruct on the shoe box.  I am going to

2   ask that the shoe at this point be removed so we don't have

3   that in front of the jury.

4        We will just simply continue the questioning.

5   Cross-examination will get into some of this to some limited

6   degree.

7        Are there any other matters we need to take care of out of

8   the presence of the jury?

9            MR. AHMED:  No, Your Honor.

10           MR. CIKUTOVICH:  No, Your Honor.

11           THE COURT:  Thank you both for your discussions.

12  Let's bring the jury back in.

13       (Jury brought back into open court at this time for the

14  following record:)

15           THE COURT:  Mr. Ahmed, you may continue your

16  questioning.

17           MR. AHMED:  Thank you, Your Honor.

18               DIRECT EXAMINATION - CONTINUED

19  BY MR. AHMED:

20  Q.   Officer Pence, was Mr. Partida sent to do the undercover

21  buy from the defendant?

22  A.   No, he was not.

23  Q.   And why is that?

24  A.   By the time that we got to, like I had testified

25  previously, he had cooperated on other individuals prior to

1    The trial in this matter commenced on January 23, 2006. After a

2  three day trial, the jury found Zavala guilty on both counts.

3    To be found guilty of Possession with Intent to Distribute 500 Grams

4  or More of Methamphetamine in violation of 21 U.S.C. § 841(a)(1) as

5  charged in Count 1, the government was required to prove beyond a

6  reasonable doubt that the Defendant:

7      (1) knowingly possesses 500 grams or more of a mixture or substance
        containing methamphetamine; and

8

9      (2) that the Defendant possessed it with the intent to deliver it
        to another person.

10    Evidence properly admitted at trial shows that Zavala was knowingly

11  in possession of a quantity of methamphetamine, and that his possession

12  was with an intent to deliver it to another person. This evidence

13  included testimony of phone calls made to Zavala to further drug

14  trafficking, Zavala's drive in the pearl white Escalade to a prearranged

15  destination, the methamphetamine found in the shoe box in his vehicle,

16  and the confidential informant (CI) Luis Partida's testimony. This

17  evidence, viewed in light of evidence of Zavala's conduct on the

18  afternoon of the attempted drug sale, is a sufficient basis to support

19  the jury's verdict on possession with intent to deliver charge.

20    To be found guilty of Use of a Communication Facility to Facilitate

21  the Commission of a Felony, in violation of 21 U.S.C. § 843(b) as charged

22  in Count 2, the government was required to prove beyond a reasonable

23  doubt that the Defendant: knowingly or intentionally used a telephone

24  to help bring about the possession with intent to distribute 500 grams

25  or more of a mixture or substance containing methamphetamine charge in

26  Count 1 of the indictment.

ORDER ~ 3

1  Q.  For the witness, Exhibit 22.  You ever seen this document

2  before?

3  A.  Yes, sir.

4  Q.  And what is this document?

5  A.  It is titled a Benton County Corrections Inmate Property

6  and/or Cash Release Authorization.

7  Q.  To your knowledge, are prisoners -- federal prisoners ever

8  taken from Spokane County down to Benton County?

9  A.  Yes, sir.  That is where they are stayed or held at at

10  this point in time.

11  Q.  Okay.  Does the defendant's name appear on this document?

12  A.  Yes, sir.

13  Q.  And does it indicate whether any property was released?

14  A.  Yes, sir.

15  Q.  And does it indicate who that person was that the property

16  was released to?

17  A.  There is a signature which I can't read it.  Next to it is

18  the printed name Irene Zavala.

19       MR. CIKUTOVICH:  Objection, Your Honor, he is just

20  going to read from the document that is not authenticated, he

21  either needs to come and read from it or the proper foundation

22  that this is a real document.

23       THE COURT:  Sustained.

24       MR. AHMED:  I will rephrase, Your Honor.

25  Q.  This document that you are looking at, is it a certified,

1    true and accurate copy?

2    A.    Yes, sir.

3         MR. AHMED:  Government would offer this exhibit, Your

4    Honor.

5         MR. CIKUTOVICH:  Could I ask a question, Your Honor?

6         THE COURT:  I am going to -- very short, all right.

7                    VOIR DIRE EXAMINATION

8    BY MR. CIKUTOVICH:

9    Q.    Do you know where this document came from, agent?

10   A.    No, sir.  I have -- I saw it just a few moments ago.

11   Q.    So you have no idea whether it came from the jail or not,

12   isn't that right?

13   A.    You are correct, sir, I have no idea where it came from.

14   Q.    Who created the document?

15   A.    I would like to answer the question first.  No, I don't

16   know where the document came from.

17   Q.    Do you know who created it?

18   A.    That would be no.

19        MR. CIKUTOVICH:  Objection, Your Honor.

20        THE COURT:  I think the concern has to do with

21   foundation as much as anything.

22        MR. AHMED:  Your Honor, I believe that would go to

23   the weight of the evidence.  I believe the witness has

24   testified that it was -- that it has the mark of Benton County

25   corrections.

ER-

ER- <span>████</span> -

1    He has also testified that it is a true and accurate

2    certified copy.

3            THE COURT:  Is the representation that it is a

4    document kept in the normal course of business?

5            MR. AHMED:  It is, Your Honor.

6            MR. CIKUTOVICH:  Objection, Your Honor.  By who?  By

7    the US Attorney?  Then I would like to call him to the stand.

8            MR. AHMED:  By Benton County corrections, Your Honor.

9            MR. CIKUTOVICH:  Where are they?

10           THE COURT:  At this point, I am going to sustain the

11   objection.  It seems to me that there needs to be some showing

12   of the nature and purpose of this item.

13   I have no problem that it is a Benton County document

14   because it is certified, but beyond that, it is also a question

15   I believe probably of relevance as to this case.

16           MR. AHMED:  Your Honor, the relevance would be that

17   the defendant --

18           THE COURT:  Shows that the wallet went back.

19           MR. AHMED:  Not only did the defendant have it, but

20   he released it to somebody in his family.  Can I ask a

21   follow-up question, Your Honor?

22           THE COURT:  Yes, certainly.

23               DIRECT EXAMINATION - CONTINUED

24   BY MR. AHMED:

25   Q.   Who was this document certified by?



ER 58

ER- <span>████</span> -

1   A.   Yes.

2   Q.   And I am not talking about based on any reports, agent, I

3   am talking about your independent recollection today, was he

4   the person that you got that cell phone from?

5   A.   Yes.

6   Q.   Were there two pounds of methamphetamine found in his

7   vehicle?

8   A.   Yes, there was.

9        MR. CIKUTOVICH:   Objection, no foundation for that,

10  Your Honor.

11       THE COURT:   Sustained.

12  Q.   Well, do you know whether methamphetamine was found in his

13  vehicle?

14       MR. CIKUTOVICH:   Objection, no foundation.

15       THE COURT:   He can ask the question whether he knows.

16  Overruled.

17  A.   Yes.

18  Q.   Do you know; how do you know?

19  A.   I was there.

20  Q.   So were there two pounds of methamphetamine found in his

21  vehicle approximately?

22       MR. CIKUTOVICH:   Objection, Your Honor.

23       THE COURT:   Overruled.

24  Q.   Answer the question, agent?

25  A.   Yes, there were two pounds --

1   so maybe out of the eight or so, I can't be exact as to the

2   number, but yes, hundreds of phone calls and if there is 25 to

3   30 participants in each case, we are talking dozens and dozens

4   of people.

5           MR. CIKUTOVICH:  Objection, Your Honor, goes beyond

6   her specialty.

7           THE COURT:  Goes beyond the specialty is the

8   objection.

9           MR. AHMED:  I am not asking her about her

10  specialization, I am asking her about her everyday experience,

11  what she has done in the past.

12          THE COURT:  Overruled.

13  Q.  Ma'am, let me ask you, in those investigations and phone

14  calls that you have listened to, is it common for people who

15  may be involved in the distribution of controlled substances to

16  use phrases that include price and quantity and the words

17  cocaine or methamphetamine?

18          MR. CIKUTOVICH:  Objection, Your Honor, she is an

19  interpreter, she is not a drug specialist.

20          MR. AHMED:  Your Honor, we offered her as a

21  translator, but I can tell you, we also submitted a resume, it

22  is on page 107 of the defendant's discovery, and I am not

23  asking her an expert opinion, I am asking her based on her

24  specialized knowledge, what she knows.

25          THE COURT:  Based upon that representation, overrule



ER- ▨ -

1    the objection.

2         MR. AHMED:  Thank you.

3    Q.   Can you please answer that.  Is it common for those that

4    may be involved in distribution of controlled substances to

5    include on their conversations things such as quantity or drug

6    names and so on?

7    A.   Yes, using code words.

8    Q.   Using code words?

9    A.   Yes.

10   Q.   And why is that?

11   A.   Because they feel that there is a -- there is an idea that

12   somebody is listening to them, that the cops are listening to

13   their phone calls.

14   Q.   Okay.  And after reviewing this transcript of the four

15   transcripts that you had in this case, and based on your

16   experience, I want you to intertwine the two, is it apparent to

17   you what is happening in this case?

18   A.   Yes.

19        MR. CIKUTOVICH:  Objection, Your Honor.  I understand

20   she has been hired to interpret an audio tape, now we are

21   asking her if she thinks there is a drug deal going down.

22        THE COURT:  I am a little bit concerned we are a

23   little bit beyond the scope of what her expertise has been

24   represented as being.

25        MR. AHMED:  Okay.  Can I have just a moment, Your

ER 61

ER- ▨ -



**U.S. Department of Justice**

Federal Bureau of Prisons

*United States Penitentiary*
*Atwater, California 95301*

**October 27, 2006**

MEMORANDUM TO: _ZAVALA 11174-085_

FROM: R. Silva, Counselor

SUBJECT: Legal Calls

The criteria for a legal call is as follows:

#1 Your Attorney must call the institution to arrange for a time with your **Case Manager**.

#2 Your Case Manager will notify you of the time and you will be responsible for being ready for the appointment.

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98

**U.S. DEPARTMENT OF JUSTICE**                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) *Case Manager Raspo* | DATE: *September 26th, 06* |
|---|---|
| FROM: *Raul Sanchez Zavala* | REGISTER NO.: *11174-085* |
| WORK ASSIGNMENT: *n/a* | UNIT: *2-A* |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

*I would like a copy of my Judgment + Sentence*
*or Judgment and Commitment.*

*I would also like to make a legal call*
*to my attorney : Karen Lindholdt (Attorney)*
*509- 744-1100*

*Thanks*

(Do not write below this line)

DISPOSITION:

*See Attach. for a copy of*
*your J+C. For legal call your*
*attorney needs to call me to set up*
*an appt. She needs to call 209-386-0257 and ask*
*to speak with Case Manager Capel in Reference to inmate Zavala*

| Signature Staff Member *Capel* | Date *9/27/06* | *#11174-08* *ER 63* |
|---|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Care Manager Ms. Capel | DATE: November 19th 06 |
|---|---|
| FROM: Raul S. Zavala | REGISTER NO.: 11174-085 |
| WORK ASSIGNMENT: VT Tutor | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

I need to contact the court via legal call
I have matters that require prompt attention.
(appeal motions, etc.)
Counselor Silva is difficult to get in contact
with.

                                                             Thanks

(Do not write below this line)

DISPOSITION:

Mr. Zavala, your attorney needs to call me
to set up an appointment. As for the courts you
either need to write to them or have your attorney
work with.

| Signature Staff Member | Date 11-20-06 | ER 64 |
|---|---|---|

- File; Copy - Inmate
ay be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

Raul S. Zavala

United States Penitentiary Atwater

P.O. Box 019001

Atwater, California 95301


Karen Lindholdt

Attorney at Law

423 W. First Avenue, Suite 240

Spokane, Washington 99201


Dear Ms. Lindholdt,

As you already know I am at Atwater,California. I
spoke with you on the phone a while back. You requested for
my counselors name and number.

Counselor: Ms. Capel     Phone: 209-386-0257

I reviewed the transcripts and other paperwork you
sent me. I am not able to find the last section of the jury
entering the court room and declaring me guilty.

Transcripts of the entire proceedings/court
appearances are not included. Please send me a copy of the
remaining transcripts at your convenience. I would like to
speak with you about other issues and issues related to the
misconduct of almost everyone involved before my trial and at
my trial.

With regards to the 2255 motion filed apparently the District Court lacks authority to entertain the said motion, so I filed two (2) motions:

1) Motion to Vacate District Court's order denying the 2255 and Remand with instructions to Dismiss Without Prejudice;

2) Motion for Extension of Time to File Application for a Certificate of Appealability.

I am not able to speak with you by way of a legal call upon my request. Counselor Capel mentioned that you would have to contact the number listed above, speak with her, and make arrangements for an appointment. As you can see it is difficult for me to make a legal call.

I thank you for your time and consideration.

Sincerely,

Raul S. Zavala

ER 66

# STATEMENT OF FACTS

**I.** On May 10, of 2005 an indictment was obtained via **PERJURY BEFORE the GRAND JURY,** (See Exhibit "A-1"), against complainant charging him with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a) (1) & 841(b) (1) (A) & 21 U.S.C § 851, and use of a communication facility to facilitate the commission of a felony in violation of 21 U.S.C. § 843(b). The issue of **PERJURY BEFORE THE GRAND JURY** is brought to the court's attention in testimony and a motion form. The court prefers not to entertain the issue by denying complainant's **MOTION to DISMISS INDICTMENT with prejudice, due to PERJURY BEFORE the GRAND JURY** by Government **AGENT JOSEPH PENCE JR.** (See Exhibit "A-2").

**II.** As a United States citizen and a citizen of the State of Washington, complainant exercises his entitled right to go to trial. Nevertheless, complainant is exposed to **MALICIOUS PROSECUTION** and the Honorable Court observing this unethical conduct fails to protect complainant from being **MALICIOUSLY PROSECUTED** by the government. The record pellucidly illustrates MALICIOUS PROSECUTION by the Government when it **ELICITED FALSE TESTIMONY** from the Government agents. (See Exhibit "B").

**III.** During the course of trial Honorable Lonny R. Suko's conduct has positively established that he lacks the capacity to discharge all the duties of office, or as a presiding Judge. The presence **of PERJURIOUS TESTIMONY** by Government agents before the Court has been highly prejudicial to complainant. The court's inaction to this matter has literally declared BIAS and INCOMPETENCE into an indisputable stage. Testimony by the government witnesses obviated that the Government participated and engaged as the architect of the proceedings. (See Exhibit "C").

**IV.** Complainant explicitly indicates that he is not addressing the wrongness of a Judicial determination, but the failure of the Court to implement corrective action during the raw miscarriage of justice in open court. On January 24, 2006 during trial and under cross-examination the Government's star and only witness –a criminal caught red handed hoping for leniency in exchange for testimony—commits PERJURY.(See Exhibit "D-1"[record was altered]). The Court fails to uphold the integrity of the Judicial system and the responsibilities of office. PERJURY is confirmed, trial is ceased and the jury is temporarily removed from the courtroom. The Government instructs the witness by indicating that he(CI) must be truthful under oath.(See Exhibit "D-2"). The Court acknowledges PERJURY and fails to take action. Trial is resumed and the witness proceeds to commit **PERJURY,** *the government and the court are aware and allow perjured testimony to go uncorrected.* (See Exhibit "D-3"). The Court at minimum does not even attempt to protect the integrity of the Judicial system or complainant's due process rights.

1

ER 67

**V.** The Court experienced and witnessed misconduct by the Government. It is evident by the record and the Government's conduct of the Government's intent to win a case at all or any cost. The Government **MALICIOUSLY INTRODUCED FALSE EVIDENCE and FALSE TESTIMONY** and the Court engages in conduct that is highly prejudicial to the effective and expeditious administration of the business of the Court by interpreting this highly prejudicial event as a mere harmless error. (See Exhibit "E").

**VI.** The Court is aware of the presence of **FRAUD** in almost every court proceeding and the Misconduct by the government, government agents, and other witnesses. FRAUD by the Government and Government agents contributed to the determinations of the Court. The Court was reluctant and skeptical to accept the obvious by resuming with the proceedings with an evasive behavior. (See Exhibit "F at page 66, lines 3-6").

**VII. OBSTRUCTION OF JUSTICE** is experienced and witnessed in open court. The Court failed to sanction of at minimum impose curative action for the contempt of court. Testifying witnesses, in attempts to evade the revealing of their corruptive participation with the Government in obtaining complainant's conviction, refuse to answer questions before the Court and proceed testifying in an evasive manner. (See Exhibit "F").

**VIII.** In retrospect the Government was able to ***maliciously convict*** complainant *with* deception, fraud in court, and the Bias and incompetence of the court. As a result on April 18, of 2006 complainant is sentenced to Life on count one (1) and eight (8) years on count two (2). Complainant's sentence is imposed by Honorable Judge Lonny R. Suko. At sentencing complainant is given the opportunity to speak. Complainant addresses the Court with the following statements. (See Exhibit "G").

**IX.** On May 2, 2006 complainant proceeding pro se, prematurely files a MOTION to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 in conjunction with an **AFFIDAVIT of BIAS**. The Court aggrieves complainant by entertaining such a petition while direct appeal is pending, when it lacked the authority to do so. The Court should have dismissed complainant's Habeas petition without prejudice to refile when his petition became ripe for review when the Court learned complainant was simultaneously pending direct appeal.(See Exhibit "H").

**X.** On June 23, 2006 the Court incompetently, unethically and with reckless disregard for the truth fails to conduct a meticulous review of the record and denies complainant's MOTION (28 U.S.C. § 2255). (See Exhibit "I"). The composite case of proceedings has manifested that the conviction of complainant was a product of **MISCONDUCT, VIOLATION of CONSTITUTIONAL RIGHTS, BIAS and INCOMPETENCE of the Court.**

RAUL S. ZAVAL - REG NO: 11174-085, USP,
P.O.BOX 019001, ATWATER, CA. 95301

ER 68

**XI.** During the course of trial the court acknowledged the violation of complainant's constitutional right's. The Court having this knowledge purposely addresses only four of the fifty-nine grounds raised in complainant's MOTION to Vacate, Set Aside, of Correct Sentence under 28 U.S.C. § 2255 and *deliberately* fails to address the entirety of complainant's MOTION by merely entertaining four of the fifty-nine grounds raised by complainant.(See Exhibit "J").

The Court's Judicial determination does not serve the purpose of this complaint, but **BIAS and INCOMPETENCE**. The Court's actions and inactions have established a clear **DERELICTION** of Judicial responsibility. Pursuant to the Codes of Judicial Conduct Honorable Judge Lonny R. Suko has violated his ethical responsibilities and has demonstrated via his conduct that he is unable to hold his position in accord with the rudimentary and procedural standards of Justice.

**WHEREFORE**, the complainant respectfully requests that this complaint against Honorable Judge Lonny R. Suko be referred to a Special Committee by the Chief Judge in accordance with RULE 9, and for such other and further relief as the Special Committee and or Judicial Council may deem just and proper.

Dated this 27th day of December, 2006.

I, RAUL S. ZAVALA, certify the foregoing is true and correct under the penalty of perjury.

RAUL S. ZAVALA

## CERTIFICATE OF SERVICE

The complainant, RAUL S. ZAVALA, hereby certifies and declares under penalty of perjury (28 U.S.C. § 1746), that five (5) true correct copies/originals of the foregoing "Judicial Complaint Form," have been mailed by placing said copies in a sealed envelope, with sufficient first-class postage affixed thereto, addressed to: Federal Court Clerk, United States Court of Appeals for the Ninth Circuit, P.O. Box 193939, San Francisco, Ca. 94119-3939.
And by personally delivering such to prison mailroom officials, for delivery to U.S. Postal Service authorities.

Dated on this 27th day of December, 2006.

RAUL S. ZAVALA

3

ER 69




Office of the Clerk
# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
95 Seventh Street
San Francisco, California 94103-1526

Cathy A. Catterson
Clerk of Court

March 14, 2007

(415) 556-9800

Raul S. Zavala
U.S.P. - Atwater
Reg. No. 11174-085
P.O. Box 019001
Atwater, CA 95301

Re: Complaint of Judicial Misconduct No. 07-89015

Dear Mr. Zavala:

Chief Judge Schroeder has issued an order in your complaint of judicial misconduct. A copy is enclosed.

A complainant or judge aggrieved by an order of the chief judge dismissing a complaint may petition the judicial council for review thereof by filing such petition in the office of the clerk of the court of appeals within 30 days of the date of the clerk's letter to the complainant transmitting the chief judge's order. 28 U.S.C. § 352(c); Misconduct Rules 5 and 6(a).

Very truly yours,

Cathy A. Catterson

CAC/gb

ER 70

**FILED**

MAR 1 4 2007

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

In re Charge of )
)
Judicial Misconduct )
)
)
_____ )

No. 07-89015
ORDER AND
MEMORANDUM

Before:   SCHROEDER, Chief Judge

A complaint of misconduct has been filed against a district judge of this circuit. Administrative consideration of such complaints is governed by the Rules of the Judicial Council of the Ninth Circuit Governing Complaints of Judicial Misconduct or Disability (Misconduct Rules), issued pursuant to the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980. 28 U.S.C. §§ 351-364.

Complainant, a pro se prisoner who was represented in proceedings before the district court, alleges that the judge demonstrated bias, incompetence, and neglect; obstructed justice; and permitted fraud and a malicious prosecution and conviction. He submitted transcript excerpts to support his contention that the judge permitted the use of perjured testimony and did not take corrective action to exclude such testimony or to report the witnesses who allegedly perjured themselves. Complainant also contends that the judge acted incompetently by entertaining a "premature" motion pursuant to 28 U.S.C. § 2255 while complainant's direct appeal was pending, then only considered four

ER 71

of complainant's 59 grounds in the motion. Complainant's exhibits, as well as the case docket sheets in the district court and Court of Appeals and selected additional filings, have been carefully reviewed.

Despite complainant's assertion to the contrary, this complaint relates to the judge's rulings and decisions, including rulings on evidence and post-trial motions, in complainant's underlying criminal case. A complaint will be dismissed if it is directly related to the merits of a judge's ruling or decision in the underlying case. 28 U.S.C. § 352(b)(1)(A)(ii); Misconduct Rule 4(c)(1). A challenge to the judge's rulings should be sought through the correct review procedure and not through the procedures for judicial misconduct. See In re Charge of Judicial Misconduct, 685 F.2d 1226, 1227 (9th Cir. Jud. Council 1982) (If complainant wants to challenge the judge's rulings, correct review procedure, "not the procedures for judicial misconduct, [is] the proper remedy.") Only a court has the power to change a decision or ruling. The judicial council, the body that takes action under the misconduct complaint procedure, does not have that authority. Even multiple or wrong legal decisions may be addressed under the ordinary course of appellate review. Charges related to the judge's rulings and decisions are, therefore, dismissed.

Although complainant submitted exhibits, he failed to provide any objectively verifiable proof (for example, names of

2

ER 72

witnesses, recorded documents, or transcripts) supporting his allegations of bias, incompetence, neglect, fraud, obstruction of justice or other misconduct. The judge specifically explained his reasons for addressing only four of complainant's grounds in the section 2255 motion. Furthermore, when complainant in the course of a Rule 60(b) motion raised the issue of the premature filing of a section 2255, motion, the judge promptly stayed his ruling on the Rule 60(b) motion until the Court of Appeals could rule on his denial of the section 2255 motion. The judge did so after acknowledging that although not "jurisdictional," the general rule is to refrain from entertaining a section 2255 motion while a direct appeal is pending. The judge's initial ruling on the section 2255 motion does not equate to incompetence permitting a finding of judicial misconduct. Conclusory charges that are wholly unsupported, as here, will be dismissed. 28 U.S.C. § 352(b)(1)(A)(iii); Misconduct Rule 4(c)(3). Complainant's remaining charges are, therefore, also dismissed.

COMPLAINT DISMISSED.

_____
Chief Judge

3

ER 73

Court Clerk, United States Court of Appeals
For the Ninth Circuit
PO Box 193939
San Francisco, CA 94119-3939

Re: Petition to the Judicial Council for Review

Dear Court Clerk:

I hereby petition the judicial council for review of the chief judge's order dismissing my judicial misconduct complaint against United States District Court Judge for the Eastern District of Washington Lonny R. Suko (Judge Suko).
Complainant submits this petition for Review to the Judicial Council seeking review of the Chief Judge's Disposition.

Complainant respectfully introduces the following claim to the Judicial Council Committee indicating that the judge's rulings and decisions, including rulings on evidence and post-trial motions are *not* the serving purpose of the complaint for judicial misconduct, but for Judge Suko's failure to initiate appropriate action and discharge his administrative responsibilities while a raw miscarriage of justice was at its peak before him. A careful scrutiny of the record in its entirety would pellucidly illustrate Judge Suko turning a blind eye to the unethical overt events that occurred in the midst of a judicial proceeding that was under his discretion.

Complainant also submits to the Judicial Council that the judge's rulings are being reviewed through the appropriate review channels and *not* being introduced through the procedures of judicial misconduct.

Furthermore, complainant also submits to the Judicial Council that pursuant to 28 U.S.C.S §372 under Code of Conduct for United States Judges, Judge Suko's conduct failed to comport with the standards that are essential to preserve the integrity of justice when he permitted a series of federal law and federal statute violations take effect during a judicial proceeding. Judge Suko exhibited a lack of interest for the integrity of justice and the preservation of public confidence in a judicial proceeding, without this basic protection any judicial proceeding under his discretion cannot reliably serve its function.

Furthermore, complainant also submits to the Judicial Council that Judge Suko's conduct diminishes public confidence, unfair to citizens and is highly offensive to the United States Constitution.

The type of analysis to be employed depends on the type of misconduct Judge Suko has exhibited.

ER 74

The above described behavior is contrary to sections of 28 U.S.C.S §372 under Code of Conduct for United States Judges reading as follows:

## UNITED STATES CODE SERVICE

### CANON 1
### A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

"A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved."

### COMMENTARY

"Although judges should be independent, they should comply with the law, as well as the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law."

### CANON 2

"A. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

### COMMENTARY

"Canon 2 A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practible to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules or other specific provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired."

ER 75

## CANON 3

### A JUDGE SHOULD PERFORM THE DUTIES OF THE OFFICE IMPARTIALLY AND DILIGENTLY

"The judicial duties of a judge take precedence over all other activities. In performing the duties prescribed by law, the judge should adhere to the following standards:

A. **Adjudicative responsibilities**. (1) A judge should be faithful to and maintain professional competence in the law, and should not be swayed by partisan interests, public clamor, or fear of criticism.(2) A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all judicial proceedings.

B. **Administrative responsibilities**. (1) A judge should diligently discharge the judges administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

…

(3) A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer." (emphasis added)

Given the continuous conduct by Judge Suko in the described proceedings of the complaint, it is at the discretion of the Judicial Council Committee to determine if this conduct by Judge Suko was intentional and if so, to impose sanctions with what would avoid the diminishing of public confidence and restore the integrity of justice that has been tainted.

Dated this 4t0h day of April, 2007.

Respectfully submitted,

Raul S Zavala

ER 76

JUDICIAL COUNCIL

OF THE NINTH CIRCUIT

**FILED**

MAY 2 1 2007

CATHY A. CATTERSON, CLERK
U. S. COURT OF APPEALS

IN RE COMPLAINT OF

JUDICIAL MISCONDUCT

No. 07-89015
ORDER

Before: KOZINSKI, THOMPSON, GRABER, WARDLAW and BERZON,
Circuit Judges, and BREYER, HATTER, MOLLOY, STRAND and
WINMILL, District Judges.

Pursuant to Chapter III of the Rules of the Judicial Council Governing

Complaints of Judicial Misconduct or Disability under 28 U.S.C. § 352(c),

complainant has filed a petition for review of the order of the Chief Judge entered

on March 14, 2007, dismissing the complaint against a district judge.

We have carefully reviewed the record and the authorities cited by the

Chief Judge in her order of dismissal. We find no basis for overturning the order

of dismissal.

For the reasons stated by the Chief Judge and based upon the controlling

authority cited in support thereof, we affirm.

ER 77